## BROWN ET AL. *v.* BOARD OF EDUCATION OF TOPEKA ET AL.

NO. 1.

Argued December 9, 1952.—Reargued December 8, 1953.—
Decided May 17, 1954.

*Robert L. Carter* argued the cause for appellants in No. 1 on the original argument and on the reargument. *Thurgood Marshall* argued the cause for appellants in No. 2 on the original argument and *Spottswood W. Robinson, III*, for appellants in No. 4 on the original argument, and both argued the causes for appellants in Nos. 2 and 4 on the reargument. *Louis L. Redding* and *Jack Greenberg* argued the cause for respondents in No. 10 on the original argument and *Jack Greenberg* and *Thurgood Marshall* on the reargument.

On the briefs were *Robert L. Carter, Thurgood Marshall, Spottswood W. Robinson, III, Louis L. Redding, Jack Greenberg, George E. C. Hayes, William R. Ming, Jr., Constance Baker Motley, James M. Nabrit, Jr., Charles S. Scott, Frank D. Reeves, Harold R. Boulware* and *Oliver W. Hill* for appellants in Nos. 1, 2 and 4 and respondents in No. 10; *George M. Johnson* for appellants in Nos. 1, 2 and 4; and *Loren Miller* for appellants in Nos. 2 and 4. *Arthur D. Shores* and *A. T. Walden* were on the Statement as to Jurisdiction and a brief opposing a Motion to Dismiss or Affirm in No. 2.

*Paul E. Wilson*, Assistant Attorney General of Kansas, argued the cause for appellees in No. 1 on the original argument and on the reargument. With him on the briefs was *Harold R. Fatzer*, Attorney General.

*John W. Davis* argued the cause for appellees in No. 2 on the original argument and for appellees in Nos. 2 and 4 on the reargument. With him on the briefs in No. 2 were *T. C. Callison*, Attorney General of South Carolina, *Robert McC. Figg, Jr., S. E. Rogers, William R. Meagher* and *Taggart Whipple*.

*J. Lindsay Almond, Jr.,* Attorney General of Virginia, and *T. Justin Moore* argued the cause for appellees in No. 4 on the original argument and for appellees in Nos. 2 and 4 on the reargument. On the briefs in No. 4 were *J. Lindsay Almond, Jr.,* Attorney General, and *Henry T. Wickham,* Special Assistant Attorney General, for the State of Virginia, and *T. Justin Moore, Archibald G. Robertson, John W. Riely* and *T. Justin Moore, Jr.* for the Prince Edward County School Authorities, appellees.

*H. Albert Young,* Attorney General of Delaware, argued the cause for petitioners in No. 10 on the original argument and on the reargument. With him on the briefs was *Louis J. Finger,* Special Deputy Attorney General.

By special leave of Court, *Assistant Attorney General Rankin* argued the cause for the United States on the reargument, as *amicus curiae,* urging reversal in Nos. 1, 2 and 4 and affirmance in No. 10. With him on the brief were *Attorney General Brownell, Philip Elman, Leon Ulman, William J. Lamont* and *M. Magdelena Schoch. James P. McGranery,* then Attorney General, and *Philip Elman* filed a brief for the United States on the original argument, as *amicus curiae,* urging reversal in Nos. 1, 2 and 4 and affirmance in No. 10.

Briefs of *amici curiae* supporting appellants in No. 1 were filed by *Shad Polier, Will Maslow* and *Joseph B. Robison* for the American Jewish Congress; by *Edwin J. Lukas, Arnold Forster, Arthur Garfield Hays, Frank E. Karelsen, Leonard Haas, Saburo Kido* and *Theodore Leskes* for the American Civil Liberties Union et al.; and by *John Ligtenberg* and *Selma M. Borchardt* for the American Federation of Teachers. Briefs of *amici curiae* supporting appellants in No. 1 and respondents in No. 10 were filed by *Arthur J. Goldberg* and *Thomas E. Harris*

for the Congress of Industrial Organizations and by *Phineas Indritz* for the American Veterans Committee, Inc.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These cases come to us from the States of Kansas, South Carolina, Virginia, and Delaware. They are premised on different facts and different local conditions, but a common legal question justifies their consideration together in this consolidated opinion.[1]

---

[1] In the Kansas case, *Brown* v. *Board of Education*, the plaintiffs are Negro children of elementary school age residing in Topeka. They brought this action in the United States District Court for the District of Kansas to enjoin enforcement of a Kansas statute which permits, but does not require, cities of more than 15,000 population to maintain separate school facilities for Negro and white students. Kan. Gen. Stat. § 72–1724 (1949). Pursuant to that authority, the Topeka Board of Education elected to establish segregated elementary schools. Other public schools in the community, however, are operated on a nonsegregated basis. The three-judge District Court, convened under 28 U. S. C. §§ 2281 and 2284, found that segregation in public education has a detrimental effect upon Negro children, but denied relief on the ground that the Negro and white schools were substantially equal with respect to buildings, transportation, curricula, and educational qualifications of teachers. 98 F. Supp. 797. The case is here on direct appeal under 28 U. S. C. § 1253.

In the South Carolina case, *Briggs* v. *Elliott*, the plaintiffs are Negro children of both elementary and high school age residing in Clarendon County. They brought this action in the United States District Court for the Eastern District of South Carolina to enjoin enforcement of provisions in the state constitution and statutory code which require the segregation of Negroes and whites in public schools. S. C. Const., Art. XI, § 7; S. C. Code § 5377 (1942). The three-judge District Court, convened under 28 U. S. C. §§ 2281 and 2284, denied the requested relief. The court found that the Negro schools were inferior to the white schools and ordered the defendants to begin immediately to equalize the facilities. But the court sustained the validity of the contested provisions and denied the plaintiffs admis-

In each of the cases, minors of the Negro race, through their legal representatives, seek the aid of the courts in obtaining admission to the public schools of their community on a nonsegregated basis. In each instance,

---

sion to the white schools during the equalization program. 98 F. Supp. 529. This Court vacated the District Court's judgment and remanded the case for the purpose of obtaining the court's views on a report filed by the defendants concerning the progress made in the equalization program. 342 U. S. 350. On remand, the District Court found that substantial equality had been achieved except for buildings and that the defendants were proceeding to rectify this inequality as well. 103 F. Supp. 920. The case is again here on direct appeal under 28 U. S. C. § 1253.

In the Virginia case, *Davis* v. *County School Board*, the plaintiffs are Negro children of high school age residing in Prince Edward County. They brought this action in the United States District Court for the Eastern District of Virginia to enjoin enforcement of provisions in the state constitution and statutory code which require the segregation of Negroes and whites in public schools. Va. Const., § 140; Va. Code § 22–221 (1950). The three-judge District Court, convened under 28 U. S. C. §§ 2281 and 2284, denied the requested relief. The court found the Negro school inferior in physical plant, curricula, and transportation, and ordered the defendants forthwith to provide substantially equal curricula and transportation and to "proceed with all reasonable diligence and dispatch to remove" the inequality in physical plant. But, as in the South Carolina case, the court sustained the validity of the contested provisions and denied the plaintiffs admission to the white schools during the equalization program. 103 F. Supp. 337. The case is here on direct appeal under 28 U. S. C. § 1253.

In the Delaware case, *Gebhart* v. *Belton*, the plaintiffs are Negro children of both elementary and high school age residing in New Castle County. They brought this action in the Delaware Court of Chancery to enjoin enforcement of provisions in the state constitution and statutory code which require the segregation of Negroes and whites in public schools. Del. Const., Art. X, § 2; Del. Rev. Code § 2631 (1935). The Chancellor gave judgment for the plaintiffs and ordered their immediate admission to schools previously attended only by white children, on the ground that the Negro schools were inferior with respect to teacher training, pupil-teacher ratio, extracurricular activities, physical plant, and time and distance in-

they had been denied admission to schools attended by white children under laws requiring or permitting segregation according to race. This segregation was alleged to deprive the plaintiffs of the equal protection of the laws under the Fourteenth Amendment. In each of the cases other than the Delaware case, a three-judge federal district court denied relief to the plaintiffs on the so-called "separate but equal" doctrine announced by this Court in *Plessy* v. *Ferguson,* 163 U. S. 537. Under that doctrine, equality of treatment is accorded when the races are provided substantially equal facilities, even though these facilities be separate. In the Delaware case, the Supreme Court of Delaware adhered to that doctrine, but ordered that the plaintiffs be admitted to the white schools because of their superiority to the Negro schools.

The plaintiffs contend that segregated public schools are not "equal" and cannot be made "equal," and that hence they are deprived of the equal protection of the laws. Because of the obvious importance of the question presented, the Court took jurisdiction.[2] Argument was heard in the 1952 Term, and reargument was heard this Term on certain questions propounded by the Court.[3]

---

volved in travel. 87 A. 2d 862. The Chancellor also found that segregation itself results in an inferior education for Negro children (see note 10, *infra*), but did not rest his decision on that ground. *Id.*, at 865. The Chancellor's decree was affirmed by the Supreme Court of Delaware, which intimated, however, that the defendants might be able to obtain a modification of the decree after equalization of the Negro and white schools had been accomplished. 91 A. 2d 137, 152. The defendants, contending only that the Delaware courts had erred in ordering the immediate admission of the Negro plaintiffs to the white schools, applied to this Court for certiorari. The writ was granted, 344 U. S. 891. The plaintiffs, who were successful below, did not submit a cross-petition.

[2] 344 U. S. 1, 141, 891.

[3] 345 U. S. 972. The Attorney General of the United States participated both Terms as *amicus curiae.*

Reargument was largely devoted to the circumstances surrounding the adoption of the Fourteenth Amendment in 1868. It covered exhaustively consideration of the Amendment in Congress, ratification by the states, then existing practices in racial segregation, and the views of proponents and opponents of the Amendment. This discussion and our own investigation convince us that, although these sources cast some light, it is not enough to resolve the problem with which we are faced. At best, they are inconclusive. The most avid proponents of the post-War Amendments undoubtedly intended them to remove all legal distinctions among "all persons born or naturalized in the United States." Their opponents, just as certainly, were antagonistic to both the letter and the spirit of the Amendments and wished them to have the most limited effect. What others in Congress and the state legislatures had in mind cannot be determined with any degree of certainty.

An additional reason for the inconclusive nature of the Amendment's history, with respect to segregated schools, is the status of public education at that time.[4] In the South, the movement toward free common schools, sup-

---

[4] For a general study of the development of public education prior to the Amendment, see Butts and Cremin, A History of Education in American Culture (1953), Pts. I, II; Cubberley, Public Education in the United States (1934 ed.), cc. II–XII. School practices current at the time of the adoption of the Fourteenth Amendment are described in Butts and Cremin, *supra,* at 269–275; Cubberley, *supra,* at 288–339, 408–431; Knight, Public Education in the South (1922), cc. VIII, IX. See also H. Ex. Doc. No. 315, 41st Cong., 2d Sess. (1871). Although the demand for free public schools followed substantially the same pattern in both the North and the South, the development in the South did not begin to gain momentum until about 1850, some twenty years after that in the North. The reasons for the somewhat slower development in the South (*e. g.,* the rural character of the South and the different regional attitudes toward state assistance) are well explained in Cubberley, *supra,* at 408–423. In the country as a whole, but particularly in the South, the War

ported by general taxation, had not yet taken hold. Education of white children was largely in the hands of private groups. Education of Negroes was almost non-existent, and practically all of the race were illiterate. In fact, any education of Negroes was forbidden by law in some states. Today, in contrast, many Negroes have achieved outstanding success in the arts and sciences as well as in the business and professional world. It is true that public school education at the time of the Amendment had advanced further in the North, but the effect of the Amendment on Northern States was generally ignored in the congressional debates. Even in the North, the conditions of public education did not approximate those existing today. The curriculum was usually rudimentary; ungraded schools were common in rural areas; the school term was but three months a year in many states; and compulsory school attendance was virtually unknown. As a consequence, it is not surprising that there should be so little in the history of the Fourteenth Amendment relating to its intended effect on public education.

In the first cases in this Court construing the Fourteenth Amendment, decided shortly after its adoption, the Court interpreted it as proscribing all state-imposed discriminations against the Negro race.[5] The doctrine of

virtually stopped all progress in public education. *Id.*, at 427–428. The low status of Negro education in all sections of the country, both before and immediately after the War, is described in Beale, A History of Freedom of Teaching in American Schools (1941), 112–132, 175–195. Compulsory school attendance laws were not generally adopted until after the ratification of the Fourteenth Amendment, and it was not until 1918 that such laws were in force in all the states. Cubberley, *supra*, at 563–565.

[5] *Slaughter-House Cases*, 16 Wall. 36, 67–72 (1873); *Strauder* v. *West Virginia*, 100 U. S. 303, 307–308 (1880):

"It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but

"separate but equal" did not make its appearance in this Court until 1896 in the case of *Plessy* v. *Ferguson, supra,* involving not education but transportation.[6] American courts have since labored with the doctrine for over half a century. In this Court, there have been six cases involving the "separate but equal" doctrine in the field of public education.[7] In *Cumming* v. *County Board of Education,* 175 U. S. 528, and *Gong Lum* v. *Rice,* 275 U. S. 78, the validity of the doctrine itself was not challenged.[8] In more recent cases, all on the graduate school

---

declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race."
See also *Virginia* v. *Rives,* 100 U. S. 313, 318 (1880); *Ex parte Virginia,* 100 U. S. 339, 344–345 (1880).

[6] The doctrine apparently originated in *Roberts* v. *City of Boston,* 59 Mass. 198, 206 (1850), upholding school segregation against attack as being violative of a state constitutional guarantee of equality. Segregation in Boston public schools was eliminated in 1855. Mass. Acts 1855, c. 256. But elsewhere in the North segregation in public education has persisted in some communities until recent years. It is apparent that such segregation has long been a nationwide problem, not merely one of sectional concern.

[7] See also *Berea College* v. *Kentucky,* 211 U. S. 45 (1908).

[8] In the *Cumming* case, Negro taxpayers sought an injunction requiring the defendant school board to discontinue the operation of a high school for white children until the board resumed operation of a high school for Negro children. Similarly, in the *Gong Lum* case, the plaintiff, a child of Chinese descent, contended only that state authorities had misapplied the doctrine by classifying him with Negro children and requiring him to attend a Negro school.

level, inequality was found in that specific benefits enjoyed by white students were denied to Negro students of the same educational qualifications. *Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337; *Sipuel* v. *Oklahoma,* 332 U. S. 631; *Sweatt* v. *Painter,* 339 U. S. 629; *McLaurin* v. *Oklahoma State Regents,* 339 U. S. 637. In none of these cases was it necessary to re-examine the doctrine to grant relief to the Negro plaintiff. And in *Sweatt* v. *Painter, supra,* the Court expressly reserved decision on the question whether *Plessy* v. *Ferguson* should be held inapplicable to public education.

In the instant cases, that question is directly presented. Here, unlike *Sweatt* v. *Painter,* there are findings below that the Negro and white schools involved have been equalized, or are being equalized, with respect to buildings, curricula, qualifications and salaries of teachers, and other "tangible" factors.[9] Our decision, therefore, cannot turn on merely a comparison of these tangible factors in the Negro and white schools involved in each of the cases. We must look instead to the effect of segregation itself on public education.

In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy* v. *Ferguson* was written. We must consider public education in the light of its full development and its present place in American life throughout

---

[9] In the Kansas case, the court below found substantial equality as to all such factors. 98 F. Supp. 797, 798. In the South Carolina case, the court below found that the defendants were proceeding "promptly and in good faith to comply with the court's decree." 103 F. Supp. 920, 921. In the Virginia case, the court below noted that the equalization program was already "afoot and progressing" (103 F. Supp. 337, 341); since then, we have been advised, in the Virginia Attorney General's brief on reargument, that the program has now been completed. In the Delaware case, the court below similarly noted that the state's equalization program was well under way. 91 A. 2d 137, 149.

the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other "tangible" factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.

In *Sweatt* v. *Painter, supra,* in finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on "those qualities which are incapable of objective measurement but which make for greatness in a law school." In *McLaurin* v. *Oklahoma State Regents, supra,* the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: ". . . his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession."

Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. The effect of this separation on their educational opportunities was well stated by a finding in the Kansas case by a court which nevertheless felt compelled to rule against the Negro plaintiffs:

> "Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." [10]

Whatever may have been the extent of psychological knowledge at the time of *Plessy* v. *Ferguson*, this finding is amply supported by modern authority.[11] Any lan-

---

[10] A similar finding was made in the Delaware case: "I conclude from the testimony that in our Delaware society, State-imposed segregation in education itself results in the Negro children, as a class, receiving educational opportunities which are substantially inferior to those available to white children otherwise similarly situated." 87 A. 2d 862, 865.

[11] K. B. Clark, Effect of Prejudice and Discrimination on Personality Development (Midcentury White House Conference on Children and Youth, 1950); Witmer and Kotinsky, Personality in the Making (1952), c. VI; Deutscher and Chein, The Psychological Effects of Enforced Segregation: A Survey of Social Science Opinion, 26 J. Psychol. 259 (1948); Chein, What are the Psychological Effects of

guage in *Plessy* v. *Ferguson* contrary to this finding is rejected.

We conclude that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment.[12]

Because these are class actions, because of the wide applicability of this decision, and because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity. On reargument, the consideration of appropriate relief was necessarily subordinated to the primary question— the constitutionality of segregation in public education. We have now announced that such segregation is a denial of the equal protection of the laws. In order that we may have the full assistance of the parties in formulating decrees, the cases will be restored to the docket, and the parties are requested to present further argument on Questions 4 and 5 previously propounded by the Court for the reargument this Term.[13] The Attorney General

Segregation Under Conditions of Equal Facilities?, 3 Int. J. Opinion and Attitude Res. 229 (1949); Brameld, Educational Costs, in Discrimination and National Welfare (MacIver, ed., 1949), 44–48; Frazier, The Negro in the United States (1949), 674–681. And see generally Myrdal, An American Dilemma (1944).

[12] See *Bolling* v. *Sharpe, post,* p. 497, concerning the Due Process Clause of the Fifth Amendment.

[13] "4. Assuming it is decided that segregation in public schools violates the Fourteenth Amendment

"(a) would a decree necessarily follow providing that, within the

of the United States is again invited to participate. The Attorneys General of the states requiring or permitting segregation in public education will also be permitted to appear as *amici curiae* upon request to do so by September 15, 1954, and submission of briefs by October 1, 1954.[14]

*It is so ordered.*

---

limits set by normal geographic school districting, Negro children should forthwith be admitted to schools of their choice, or

"(b) may this Court, in the exercise of its equity powers, permit an effective gradual adjustment to be brought about from existing segregated systems to a system not based on color distinctions?

"5. On the assumption on which questions 4 (a) and (b) are based, and assuming further that this Court will exercise its equity powers to the end described in question 4 (b),

"(a) should this Court formulate detailed decrees in these cases;

"(b) if so, what specific issues should the decrees reach;

"(c) should this Court appoint a special master to hear evidence with a view to recommending specific terms for such decrees;

"(d) should this Court remand to the courts of first instance with directions to frame decrees in these cases, and if so what general directions should the decrees of this Court include and what procedures should the courts of first instance follow in arriving at the specific terms of more detailed decrees?"

[14] See Rule 42, Revised Rules of this Court (effective July 1, 1954).