Van Voorhis, J. (dissenting and voting to reverse and reinstate the order of Special Term).
If, as I think, the action by the Commissioner of Education violates the Constitution of the United States and the Constitution and statutes of New York State, it is reviewable in the courts as included in the class of conduct which is legally defined as purely arbitrary (Matter of Ross v. Wilson, 308 N. Y. 605).
By directing that all pupils from kindergarten through grade 3 attend the Davison Avenue or Lindner Place Elementary School, and that all pupils in grades 4 and 5 attend the Wood-field Road School, after adopting the finding of his Advisory Committee that the attendance areas of these schools as defined by the Board of Education could be cited as an excellent example of administrative planning except for racial difference, the Commissioner of Education has made clear that he reversed the ruling of the Board of Education entirely in order to correct or reduce imbalance between the black and white races. The court is confronted directly with whether racial imbalance in the public schools, however it may be defined, can be overcome by admitting or excluding children from schools on account of their color. The purpose in the Commissioner’s ruling is to blend the 75% Negro children in the Woodfield School with the white children in the other two elementary schools. The concentration of nonwhite children in the Woodfield School attendance area was not designed to promote racial segregation in the public schools but occurred on account of the geographical grouping of the races.
Section 3201 of the Education Law prevents a person from being excluded from any public school “ on account of race, creed, color or national origin.” Other statutes and constitutional provisions call for the same result (cf. U. S. Const., 14th Amdt. § 1; N. Y. Const., art. I, § 11; Education Law, § 313; Civil Rights Law, § 40; Executive Law, § 290).
The Supreme Court of the United States has held that Negroes cannot be “ denied admission to schools attended by white children under laws requiring or permitting segregation according to race ” without denying the equal protection of the law (Brown v. Board of Educ., 347 U. S. 483, 488; 349 U. S. 294). That principle is contradicted by the holding of the Appellate Division in this case. Where is the line to be drawn between *269 allocating persons by law to schools or other institutions or facilities according to color to promote integration, and doing the same thing in order to promote segregation? Is the underlying principle not the same in either instance? Both depend on racism. If one is legally justifiable, then so is the other. There is no law which says that school children or others may be allocated according to race until there are 50% of each. If that be the guiding principle, it is honored more in the breach than in the observance.
There is an important difference between obliterating the color line by admitting a boy or girl or man or woman to a school, to employment, to a residential location or to a place of public accommodation without regard to color, and allocating people to locations, employments or facilities because of their color. The latter is what the Commissioner of Education has done in this instance. It is one thing to insist that a person should not be excluded by law from a vocation, school, theatre, hotel, restaurant or public conveyance because of color; it is quite another matter and, as it seems to me, doing the reverse, to allocate these advantages according to racial quotas or on some other proportional racial basis.
Racial questions are acute today. They occupy a great deal of public attention. At other times religious issues or questions of national origin have bulked large. Considered as a question of constitutional or statutory law, is there any more justification to billet Negroes and Caucasians here and there by law, so as to assemble them or keep them apart, than would be the case, for example, if the Commissioner of Education were to decide to do the same thing with Catholics, Protestants, Jews or any other ethnological or religious group? Could he legally determine, for instance, that there were too many Catholics and not enough Jews in a particular school, or that some Presbyterians, Episcopalians or Swedenborgians should be added to bring their particular cultural leavens? Or, on the effect of inferiority complexes induced by the appearance of status or the lack of it, can similar measures be taken by law to avert de facto imbalance between the successive waves of immigrants who have come to these shores during the last century or less, each of whom has been inclined to look deprecatirigly at the next most recent arrival? Could the Commissioner legally compel the altera *270 tion of school populations on the ground that there were too many of southern European extraction and not enough Celtic in a particular school, and that psychological damage was being done because the latter looked down on their fellow citizens who came more recently from southern Europe and therefore had not achieved the same distinction in America as though they had immigrated earlier in time? National origin and religion are bracketed with racial discrimination in all of these statutes and decisions. The Commissioner of Education seems to have realized this in 1956 (after the United States Supreme Court decided the Brown case) in a determination by him reported in 77 State Department Reports at page 37, and referred to in the opinion of Special Term (41 Misc 2d 200, 204). There, although it was asserted that pupil attendance in one of the schools in an attendance area would be 80% Negro, the Commissioner, denying relief, said (p. 38): “ Because of the incidence of location, the mere fact that the preponderance of the children who would normally attend the neighborhood school happened to be white or negro, of Polish, Irish, Scotch, Swedish, Italian or English descent or otherwise or who espouse one religion or another, does not require a board to attempt to gerrymander the lines, to assign but a certain percentage to a particular school. This would constitute as much discrimination as a gerrymandered line to accomplish the opposite effect.”
This is as true now, it seems to me, as it was when the Commissioner said it in 1956. Nor does it legalize the utilization of race, religion or national origin, as a basis for allocation of students that, instead of gerrymandering the district, pupils are transferred from one school to another on the basis of race. It is true that the racial question in this' country is today of outstanding importance, and that a great deal of attention and ability is being focused upon its solution. Old and deeply embedded but artificial lines of distinction are being removed; employment, housing and public accommodations as well as schools are being opened to many for whom they were long overdue. But because it is becoming recognized that for many years the Negro has been unfairly discriminated against, it does not follow that the balance can legally be redressed by quota systems, or their equivalent, which operate on the basis of *271 distinctions based on race, religion or national origin instead of their negation.
The Supreme 'Court of the United States held in the Brown case that de jure segregation denies the equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution. It did not relate to de facto segregation, nor hold that educational authorities were obliged or empowered to eliminate racial imbalance by resorting to the racial distinctions which the Brown decision inhibited.
I vote to reverse the order of the Appellate Division and to reinstate the order of the Special Term on the opinion at Special Term and on the dissenting opinion in Matter of Balaban v. Rubin (14 N Y 2d 193, 199).