McBRIDE, Judge.
This litigation arises as the' result of a written contract of lease between plaintiff, Lincoln Beach Corporation, and defendant, The Board of Commissioners of the Orleans Levee District. On March 9, 1955, one Emile Bruneau entered into a lease agreement with the then Board of Levee Commissioners, the subject of which is certain property of which said Board has *369 jurisdiction described as Lincoln Beach located in the City of New Orleans on the south shore of Lake Pontchartrain. The lease term was ten years beginning January 1, 195S, and ending December 31, 1964, the lessee to have an option to renew for another ten-year period. The lessee was specifically granted the right to assign the lease.
The lessee bound himself to operate a public amusement park or recreation center on the property, consisting of a bathhouse, swimming pool, various attractions, devices and amusements, such as scenic railway, flying horses, caterpillar, airplane rides, and other amusement features common to such parks and for the further purpose of selling food and drinks.
At the option of the lessor the yearly rental would be $7500, payable in advance, or 2% of the lessee’s gross receipts.
On April 6, 1955, Bruneau assigned the lease to plaintiff, Lincoln Beach Corporation. At the time of the confection of the lease, March 9, 1955, and at the time of said assignment, it was contemplated and intended by all parties that Lincoln Beach would be operated as an amusement park for Negro patrons only, this because another amusement park known as Pontchartrain Beach was being operated exclusively for white persons by a lessee of the Board of Commissioners of the Orleans Levee District on levee board property situated on the south shore of Lake Pontchartrain at the termination of Elysian Fields Avenue. The Board of Commissioners entered into the lease with Bruneau desiring to have established for the benefit of Negro inhabitants of New Orleans a separate amusement park similar to Pontchartrain Beach.
In May, 1954 the Supreme Court of the United States handed down its landmark decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, in which it was held the segregation of children in public schools solely on the basis of race, even though the physical facilities and ' other tangible factors may be equal, deprives the children of a minority group of equal educational opportunities, and amounts to a deprivation of the equal protection of the laws guaranteed by the Fourteenth Amendment to the Federal Constitution.
The Louisiana Legislature in an ineffective attempt to counteract the feared impact of the decision in Brown v. Board of Education of Topeka, adopted Act No. 14 of 1956, (R.S. 33:4558.1) under what was thought to be the state’s police power, in which it was provided in part, that:
“All public parks, recreation centers, play grounds, community centers and other such facilities at which swimming, dancing, golfing, skating or other recreational activities are conducted shall be operated separately for members of the white and colored races.”
It is a matter of common knowledge that the ominous implications of the decision in Brown v. Board of Education of Topeka gradually took hold in the southern states and the feeling developed that the doctrine enunciated in that case might well be applied to other activities conducted by the states or political subdivisions thereof. The then Board of Commissioners of the Orleans Levee District and the assignee of Bruneau’s lease had misgivings as to the legality of a segregated amusement park and in order to grant the assignee an opportunity to recede from the lease should intergration of the races at Lincoln Beach Amusement Park become imminent, the lease, on August 25, 1957, was amended by agreement of the Board of Commissioners and Lincoln Beach Corporation so as to provide the following :
“Lincoln Beach Amusement Park and the facility leased hereunder, was at the inception date of this lease and shall always be intended by the parties hereto, their heirs, successors and assigns, to be for the exclusive use of colored persons, *370 meaning members of the negro race only.
“The original lease agreement was entered into with such intention, as outlined above, for the benefit of the public as a whole and in order to keep the races segregated, at such amusement park and facility.
“The leased premises being public property and it being intended that the lessee should continue the operation thereof on a high plane for the benefit of the public and to do so, requiring annual expenditures of large sums of money on improvements, betterments and equipment, it is hereby mutually agreed between the parties hereto as follows:
“That at the option of lessee, his heirs, successors, or assigns, should separation and segregation of the races become impossible because of decrees or judgments of duly -constituted court or courts of final resort, then in such an event, said lessee shall enjoy the unqualified right and privilege to cancel this lease, by giving thirty days written notice to lessor, through registered mail advising that such right of cancellation has thereby been invoked and exercised.
“Under such conditions, the lessor shall be bound and obligated to purchase such improvements, betterments and equipment, owned by the lessee and used in the operation of the amusement park and facility, at the fair market value for same, after due appraisement by two competent appraisers, one to be selected by lessor and the other by lessee. In the event the appraisers fail to agree, a third shall be selected by them who shall act as the sole and final arbiter after hearing both appraisers and proper study of the situation. Should the two first named appraisers in disagreement fail to agree upon a third appraiser within a reasonable period of time, then either party hereto shall enjoy the right to initiate litigation to settle the disputed issues involved.
“It is intended by the parties hereto that the cancellation and final settlement shall be accomplished as expeditiously as possible, following the written notice recited above.”
In February, 1958, the United States Circuit Court of Appeals, Fifth Circuit, in New Orleans City Park Improvement Ass’n v. Detiege, 252 F.2d 122, aff. 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46, under the doctrine of Brown v. Board of Education of Topeka, enjoined the City from denying Negroes, solely on account of their race or color, the use of the facilities of the New Orleans City Park.
Then in July, 1963, a three-judge United States District Court in Barthe v. City of New Orleans, Louisiana, 219 F.Supp. 788, after citing New Orleans City Park Improvement Ass’n v. Detiege, supra, among other cases, ordered the City of New Orleans to forthwith desegregate its parks, playgrounds, community centers, and all recreational and cultural facilities and activities. The court said segregation “ * * * js practiced under the Louisiana Anti-Mixing Statute, LSA-R.S. 33:4558, as well as by long-standing custom. * * * It is no longer open to question that a State may not constitutionally require segregation of public facilities.” The Louisiana statute was specifically declared unconstitutional.
Notwithstanding the mentioned decisions of the federal courts, plaintiff corporation continued to operate Lincoln Beach on a segregated basis. The evidence shows that on a few occasions when a person other than a Negro entered the amusement park his removal from the premises was requested. So far there never had been a decision of a federal court dealing with the operation of an amusement park by a private individual or domestic corporation on state owned land. On December 15, 1963, Lincoln Beach Corporation exercised its option to renew the lease, as amended, for an additional ten-year term.
*371 Parenthetically, it might he mentioned that the United States Court of Appeals, Fifth Circuit, in February, 1965, held in Wimbish v. Pinellas County, Florida, 342 F.2d 804, that where a county leased land to a tenant for the purposes of operating thereon a public golf course, that Negroes could not be excluded from the golf course solely because of their race.
Things remained in status quo until July 2, 1964, when the President of the United States signed into law the 1964 Civil Rights Act (Public Law 88-352, 78 Stat. 241), which, among other things, provided that all persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, and advantages of any place of public accommodation, without discrimination or segregation on the grounds of race, color, religion, or national origin.
Thereupon, believing that segregation had “become impossible,” Lincoln Beach Corporation decided to avail itself of the resolutory condition. On July 6, 1964, it gave the Board of Commissioners the requisite 30 days written notice of the exercise of its privilege to cancel the lease. Defendant admits receipt thereof.
In the notice Lincoln Beach Corporation demanded that the Board of Commissioners of the Orleans Levee Board purchase all improvements, betterments and equipment owned by the lessee and used in the operation of Lincoln Beach at their fair market value, and requested that two appraisers be selected in accordance with the provisions of the amendment to the lease. Shortly thereafter Lincoln Beach Corporation appointed its appraiser, but the then Board of Commissioners made no appointment of its appraiser or appraisers until a year afterward. It seems that the Board resorted to delaying tactics and did nothing to bring about a termination of its relations with Lincoln Beach Corporation in accordance with the lease provisions.
This suit was filed November 4, 1964. Lincoln Beach Corporation, after alleging the pertinent facts, prayed for judgment against the present Board of Commissioners of the Orleans Levee District for $450,000, as a fair market value of the improvements, betterments and equipment the defendant agreed to purchase should the lessee terminate the lease because segregation had become impossible; plaintiff sought to recover $13,302.56 additionally as damages. The Board of Commissioners answered the suit setting forth that the amusement park was to be operated for the benefit of the general public as there was no mention in the lease as to the use of the facility by persons of any particular race, color or creed and that there was no consideration for the amendment to the lease dated April 25, 1957, and, therefore, said amendment is null and void. Defendant further claimed the amendment to be contrary to good morals and a nullity and alleged that at the time the notice of cancellation was given by the lessee there had been no decree or judgment of a duly constituted court of final resort holding that segregation at Lincoln Beach was illegal. The defendant then asserted a reconven-tional demand seeking to recover of plaintiff $519,269 for alleged advances made for it and for certain services furnished and expenses incurred for the benefit of plaintiff.
After a protracted trial the judge below resolved the issues in plaintiff’s favor, rendering judgment against the defendant in the amount of $264,693.48, with interest and costs. The reconventional demand was dismissed. The Board of Commissioners of the Orleans Levee District has appealed.
Counsel for the appellant in his assignment of errors complains that the trial court erred in the following particulars: (1) In failing to hold the amendment to the lease invalid on the ground that there was no consideration or cause therefor; (2) in failing to hold said amendment invalid for the reason that it was contra bonos mores; (3) in failing to hold that segregation at Lincoln Beach had not become “impossible” since at the time the lease was sought to be cancelled there was no decree or judgment of a court *372 of final resort particularly affecting the operation of Lincoln Park; (4) in rendering judgment for an amount far in excess of the fair market value of the property located on Lincoln Beach; and (5) in dismissing the reconventional demand.
' Counsel postulates that there was no consideration for the August 25, 1957 amendment to the original lease. We need not discuss consideration therefor because the original lease as amended was renewed for a further term of ten years by plaintiff on December 15, 1963. The amendment was part and parcel of the lease as renewed. Within the purview of R.C.C. art. 2676 et seq., in a lease there must be a thing, a price, the consent of the parties, and an implied obligation of warranty, etc. The relationship of landlord and tenant results from a commutative contract and the reciprocal rights and obligations of the parties stipulated therein constitute a consideration or cause for the agreement. A percentage to a landlord of lessee’s receipts from the operation of an amusement park is a valid consideration for the lease. Roussel v. Dalche, 158 La. 742, 104 So. 637.
Counsel for defendant Board also argues that the provision that plaintiff may at its option cancel the lease if segregation became impossible is a reprobated potestative condition and hence null and void. Article 2034 of R.C.C. provides :
“Every obligation is null, that has been contracted, on a potestative condition, on the part of him who binds himself.”
Article 2035 stipulates:
“The last preceding article is limited to potestative conditions, which make the obligation depend solely on the exercise of the obligor’s will; but if the condition be, that the obligor shall do or not do a certain act, although the doing or not doing - of the act depends on the will of the obli-gor, yet the obligation depending on such condition, is not void.”
There is no potestative condition. Plaintiff did not have the unlimited or unqualified right to terminate the lease at will. The agreement was that in case segregation of the races became untenable because of the decisions of the federal courts, plaintiff would be entitled to the relief of disengaging himself from a contract which might prove to be unprofitable. The abrogation of the lease could not take place until the happening of an event over which the lessee had no control, to-wit: unfavorable decisions by federal courts, and until the event took place plaintiff possessed no right to cancel. In consequence, the termination of the lease did not depend solely on the exercise of the obligor’s will. See New Iberia Sugar Co. v. Lagarde, 130 La. 387, 58 So. 16.
It is also argued on appellant’s behalf that the lessee’s option to cancel is contra bonos mores and thus of no legal effect. There is no merit in this contention. The parties to the lease made no agreement to maintain segregation of the races. The lessee was given the benefit of the escape clause in the event segregation became “impossible.” The whole tenor of the record makes manifest the fact that the parties had in mind that economic repercussions might be visited upon Lincoln Beach Corporation should it become impossible to carry on a segregated activity, and this, and not integration per se, prompted inclusion of the cancellation clause. Pontchartrain Beach being operated solely for white persons and plaintiff under the lease operating Lincoln Beach for Negro inhabitants of New Orleans, it is not difficult to comprehend that if the races could no longer be segregated that plaintiff might suffer extensive financial losses. This is demonstrated by the fact that a similar cancellation clause was inserted into the lease the Board of Com *373 missioners has with the operators of the white amusement park.
The contention is also advanced that plaintiff was not entitled to avail itself of the option to cancel because there is no evidence that a suit seeking the integration of .'Lincoln Beach had ever been filed against •the plaintiff or that any judgment was rend■ered against it striking down segregation .at its amusement park.
We do not interpret the language of •the amendment to mean that the right of •cancellation would arise only after a specific judgment was rendered ordering plaintiff to integrate. Most of the federal cases ordering integration of given facilities were class actions and it became obligatory for plaintiff to comply with the decisions of the courts.
Few persons entertained any notion that the decision in Brown v. Board of Education of Topeka, supra, would be used as a •criterion to integrate all public facilities especially one operated by a private person or corporation. We think that the United States Supreme Court affirming, under the doctrine of the Brown case, New Orleans City Park Improvement Ass’n v. Detiege, supra, which permanently enjoined the City from denying Negroes, solely on account of their race or color, the use of the facilities -of the New Orleans City Park, sounded the death knell of segregation in public facili•ties. The coupe de grace was the Civil Rights Act of 1964. Segregation became “impossible” within contemplation of the parties when the separation of the races -could not longer be legally maintained.
Article IV, § 12, Const. 1921, also came •'in for some discussion. This constitutional section provides that the funds, credits, property or things of value of the State, or .any political corporation thereof, shall not "be loaned, pledged or granted to or for any -person or persons, public or private. The argument made is that the then Board of -Commissioners of the Orleans Levee District in agreeing to the cancellation clause embarked on “one of the greatest give-away programs ever instituted in this state” in direct violation of said constitutional provision. Counsel points to the stipulation which obligate the Board to purchase the improvements, betterments and equipment owned by lessee and used in the operation of the amusement park, at their fair market value thereof, in the event lessee exercised the option to cancel the lease.
We cannot construe the obligation to purchase as a loan, pledge or grant of state funds. The Board of Commissioners of the Orleans Levee District has the right to enter into contracts and under Art. XVI, § 7(c) of the Constitution is empowered, among other things,
“ * * * to construct and equip and maintain playgrounds, places of amusement and entertainment, golf links, gymnasiums, swimming pools, bathing beaches, aviation fields and other like places.”
The above enumerated power carried with it the right to purchase plaintiff’s effects. Agreements legally entered into have the effect of laws on those who have formed them. R.C.C. art. 1901. This is no less so because one of the contracting parties is a public board. Whether the contract was disadvantageous to the Board of Commissioners is not for us to say. It is well settled that the parties may make their own contracts, and however unusual they may be or what drastic or unreasonable features there may be therein, they form the law between them and should be enforced so long as they do not contravene good morals or public policy. Arkansas Fuel Oil Corporation v. Maggio, La.App., 141 So.2d 516.
Appellant complains that the judgment in favor of plaintiff for $264,693.48 far exceeds a fair market value of lessee’s equipment, buildings, games and rides, located on Lincoln Beach. It is contended that the fair market value is no more than $52,150.
Upon the notice of cancellation becoming effective, plaintiff appointed its appraiser to inventory and determine a fair market *374 value of the effects defendant hoard was obligated to purchase. Plaintiff’s appraiser, Kuebel, a member of the American Institute of Real Estate Appraisers and other professional associations, with many years’ experience not only in appraising buildings but also in appraising movables, duly assisted by Claiborne Perrelliat, a civil engineer and officer of a construction company, made a minutely detailed and comprehensive inventory and fair market value appraisal of all of lessee’s effects at Lincoln Beach and on November 3, 1965, submitted said inventory together with a report. The fair market value of the property as of August 6, 1964, was fixed at $305,000. Kuebel ascertained the cost price of all of the property and after deducting what he considered a proper depreciation entered the difference as the value of each article. He testified that his net appraisal represents a fair market value.
In contending that the value at most was $52,150, appellant relies on the appraisal of one of its experts. We cannot accord much consideration to the appraisals of any of defendant’s experts because the evidence discloses that defendant Board persisted in resisting a cancellation of the lease and did not appoint appraisers until a year after the cancellation became effective. Thus, the property on Lincoln Beach was exposed to the elements for a long period after the cancellation and we can readily understand why any appraisements that defendant had made of the property would naturally be less than the value shown by the report of plaintiff’s expert.
Plaintiff prayed for a judgment of $463,302.56 allegedly being the fair market value of lessee’s property, including $13,-302.56 as damages. The court below rendered judgment for plaintiff for $264,693.48 represented by the following items :
“A. Values of buildings and equipment:
Buildings, improvements and betterments $ 73,609.40
Ride equipment 150,449.01
Equipment, games 1,511.55
Electric freeze, arcade and shooting 7,377.02
Equipment, miscellaneous 10,664.83
Auto and truck 1,203.83
Office furniture and equipment 1,927.40
Merchandise used for game prizes 1,673.09
Ride parts 2,914.82
Small tools 114.29
Supplies, maintenance shop 500.00 $251,945.24
“B. Expenses after August 6, 1964:
Watchmen services, Scheming Detective Agency $ 2,022.80
Water bills 23.33
Automobile supplies and repairs 576.93
Telephone charges 8-22-64 to 5-22-65 340.97
Insurance 8-6-64 to 6-17-66 252.86
Fire and lightning insurance 3,423.00
Wages for property preservation 731.80
Pro-rata taxes and licenses 1,501.30
Pro-rata mechanical inspection fees 45.46
Personal and property taxes and franchise taxes 788.79
Refund rent pro-rata 3,041.00 12,748.24
Total— $ 264,693.48”
*375 We have carefully studied and analyzed the testimony of the appraisers, as well as Kuebel’s written report, and we cannot see that there is any error in the amount awarded by the judge below as the value of the buildings and equipment. The evidence .also convinces us that the allowance of $12,-748.24 for expenses after August 6, 1964, is due plaintiff. It has not been convincingly pointed out to us in what particulars the judgment is excessive.
The reconventional demand was correctly dismissed. Defendant prayed for judgment against plaintiff for $601,769.00 composed of the following items:
Ten year’s rent from Dec. IS, 1963 $ 75,000.00
Rent due February 1, 1964 7,500.00
Salary and Wages 301,041.00
Supervision, General Overhead 86,373.00
Signs, maintenance thereof 39,435.00
Supplies 46,946.00
Electric Bills 27,521.00
Equipment 8,899.00
Repairs 2,225.00
Miscellaneous Items 6,829.00
Two former presidents of the Board of ■Commissioners of the Orleans Levee Board who held office during the term of the lease .•substantiated plaintiff’s denial that any of ■the expenses above mentioned were to be borne by the lessee. The record shows also there was no past due rent. The claim for ■rentals beyond the date the lease was can-celled is without merit. It seems that the •claim embodied in the reconventional demand was an afterthought, it not appearing •that any demand for payment was ever made upon the lessee during the tenure of the lease.
We do perceive, however, that the judgment should be amended so that title to the items shown on the inventory and listed .above, which the Board of Commissioners bound itself to purchase upon cancellation of the lease, should be decreed to be the property of the Board of Commissioners upon its payment of the judgment.
For the reasons above assigned, the judgment appealed from is amended so as to provide that upon its payment and satisfaction of the judgment the property listed on •the inventory of Kuebel and enumerated .above shall become the property of the Board of Commissioners of the Orleans Levee District, and as thus amended and in all other respects the judgment is affirmed.
Amended and affirmed.