806 F.2d 790
 42 Fair Empl.Prac.Cas. 749,
41 Empl. Prac. Dec. P 36,707, 36 Ed. Law Rep. 313
 Learrie WHITE and Rubye Talbert, Appellants,
v.
UNIVERSITY OF ARKANSAS, James E. Martin, President, Raymond
Miller, President of the Board of Directors; Diane Nolan,
Bradley Jesson, Jacquelin Douglas, Robert Pugh, Hugh
Chalmers, Kaneaster Hodges, Jr., Gus Blass, II, Paul Adams,
III, Jack Williams, The Board of Directors and W.J. Moline,
Director of the Cooperative Education Service, Appellees.
 No. 84-2545.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 15, 1986.
Decided Dec. 4, 1986.
 
 John W. Walker, Little Rock, Ark., for appellants.
 Fred H. Harrison, Little Rock, Ark., for appellees.
 Before ARNOLD, JOHN R. GIBSON and WOLLMAN, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Learrie White, a black male, and Rubye Talbert, a black female, employees of the University of Arkansas Cooperative Extension Service, appeal the district court's denial of their claims for back pay and injunctive relief. White and Talbert alleged that the University denied them pay and job promotions commensurate with their white counterparts because of their race, and in Talbert's case, also her sex. The district court found that while each plaintiff established a prima facie case, the University established that its decisions were based on low job performance evaluations received by plaintiffs and other legitimate criteria. White and Talbert argue that the district court's findings are clearly erroneous because the evaluations were based on overly subjective criteria, were not uniformly applied, and were prepared exclusively by white managers. We conclude that while the district court's findings of fact are not clearly erroneous, our opinion in Bibbs v. Block, 778 F.2d 1318 (8th Cir.1985) (en banc)--an opinion filed after the present case was tried--dictates that we vacate this judgment and remand the action to the district court for reconsideration and further findings of fact.
 
 
 2
 White began with the Extension Service in 1954 as an Assistant County Agent for Negro Work. Some time before 1973, White was promoted to his present position of Extension Farm Management Specialist III, a position comparable to that of a University faculty member. As a Specialist, White's role was to communicate agricultural and technological information to county organizations and farmers. When White was hired, he held a master's degree in agricultural economics and testified that throughout his career he has remained abreast of developments in his field. Talbert began with the Extension Service in 1958 and served as an Assistant Home Demonstration Agent until 1976, when she was promoted to the position of Home Extension Economics Leader. In these capacities, Talbert gathered information and held meetings with homemakers and the general public to convey information and demonstrate new techniques in home economics.
 
 
 3
 When White and Talbert were first employed, the Extension Service was racially segregated. White males dominated the supervisory positions. Whites were paid more than their black counterparts, men more than women. After the passage of the Civil Rights Act of 1964, the dual system was abolished, but white males continued to dominate the higher paying supervisory positions. To eliminate these disparities, between 1973 and 1975, salaries were wholly revised based on education, seniority, and past job performance. Since then, annual increases have been pegged to job evaluations, based on the established criteria, which rate the employees' performances on a one-to-five scale, with "one" being "excellent." Because the annual increases are calculated as a percentage of the employee's previous year's salary, substantial pay differences have developed over the years between those consistently receiving "one" ratings and others consistently receiving lower ratings. In rare instances, market demands or the need to obtain or retain an individual with specialized skill has required the Extension Service to augment the salary dictated by the standard criteria.
 
 
 4
 White complains that he has not been promoted since before the Extension Service was integrated, and that, while he has been with the Extension Service longer than all but eight other employees, he is fifty-fourth in terms of salary. He claims that promotions and higher pay have gone instead to white males with less seniority and no better academic credentials. The district court found that while higher level positions for which White may have qualified became available since he was last promoted, White never applied, as required, for any of these positions. The court reasoned that because White did not apply he waived any challenge to the Extension Service's failure to promote him. The district court also rejected White's disparate pay claim. The court credited the testimony of Reuben Johnson and Kenneth Bates who testified that White received low ratings because he did not communicate well, was not aggressive, and did not undertake postgraduate study in his field. The court found that White's lower salary resulted from the consistently received low ratings, which the court further found were based on fair, nondiscriminatory criteria.
 
 
 5
 Talbert complains that her failure to obtain a promotion to Staff Leader in 1980 and her relatively low salary were the result of discrimination based on race and sex. The district court found, based on the testimony of several witnesses who supervised her, that "at best, Mrs. Talbert's work was satisfactory," slip op. at 4, and that her job evaluations were based on legitimate criteria. The court further found that Talbert never sought administrative review of her evaluations, although she had the right to appeal, and that, during each of the past eleven years, Talbert completed a personnel form in which she expressed satisfaction with her job and location. The district court concluded that Talbert's claims of lack of advancement and disparate pay resulted not from discrimination on the basis of race or sex, but on legitimate, nondiscriminatory, and unchallenged job performance evaluations.
 
 
 6
 The district court, based upon the factors emphasized in Kirby v. Colony Furniture Co., 613 F.2d 696 (8th Cir.1980), found that White and Talbert established a prima facie case. In so doing, the court found that a dual system of employment had been operated by the Extension Service until 1964; that white males historically held supervisory and better paying jobs; that white males with less seniority and no better academic credentials received promotions while White and Talbert did not; and that white males with less seniority and no better academic credentials received significantly greater salary increases than White and Talbert. The court specifically found that White established a prima facie case of racial discrimination for his claims of disparate pay and lack of promotion, and Talbert established a prima facie case of racial discrimination both because she was not promoted to the job of Staff Leader of Ashley County in 1980 and because she received disparate pay.
 
 
 7
 The district court, however, found that the University established legitimate nondiscriminatory reasons for the lack of promotions and disparate salary. White had not been promoted because he had not applied. His salary was lower than that received by co-workers because of his low evaluation ratings. Talbert was not promoted to Staff Leader in 1980 because she was less qualified than the white male selected for the job. Her salary directly reflected her evaluation ratings. The court further found that neither White nor Talbert showed that the University's articulated reasons were pretextual. The district court therefore denied the claims for back pay and injunctive relief. This appeal followed.
 
 
 8
 In charging that the evaluations were based on overly subjective criteria, were not uniformly applied, and were prepared exclusively by white managers, White and Talbert essentially urge us to overturn the district court's finding that the evaluations were based on fair, reasonable, and nondiscriminatory criteria. The district court heard testimony of both White's and Talbert's supervisors, who described in detail the factual bases for their evaluations. The evidence established that from 1970 to 1982 White received the lowest rating of any black Specialist in the Extension Service and that Talbert received among the lowest ratings. Admittedly, the Extension Service has suffered a history of discrimination against blacks, and vestiges of the pre-1973 system remain in the inadequate number of blacks in supervisory positions. Nevertheless, neither White nor Talbert has shown how this inadequacy has affected black employees. To the contrary, the testimony of Rueben Johnson indicates that all black employees similarly situated to White received higher ratings. Nor has White or Talbert established that the evaluation system was based on overly subjective criteria. Appellants' positions required public relations and communication skills, the evaluation of which is inherently subjective. Subjective job evaluations are unlawful only if they are unrelated to an essential business purpose. See Green v. Board of Regents, 335 F.Supp. 249 (N.D.Tex.1971), aff'd, 474 F.2d 594 (5th Cir.1973). White and Talbert failed to show that the criteria were overly subjective.
 
 
 9
 Having assessed the witnesses' credibility, the district court found that White and Talbert were evaluated on the basis of fair, nondiscriminatory criteria. The court further found that their not being promoted and their relatively low salaries were based on the job evaluations. We have reviewed the entire record in this case and are unable to conclude that the findings of the district court are clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 
 10
 Notwithstanding this conclusion, we believe there is another matter that was not and could not have been dealt with by the district court. In Bibbs v. Block, 778 F.2d 1318 (8th Cir.1985) (en banc), an opinion filed after this case was tried, we explained that Title VII is violated not only by failing to hire or promote or retain an employee because of race or sex, but also by putting an employee at any kind of disadvantage because of race or sex. We said:
 
 
 11
 It is not only failing to hire someone, or discharging him or her, because of race or sex, that is unlawful. The statute also forbids employers "otherwise to discriminate ... with respect to compensation, terms, conditions, or privileges of employment, because of ... race," Sec. 703(a)(1), and makes it unlawful for employers "to limit ... or classify ... employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect " him or her because of race. Section 703(a)(2). To put it in terms of the present case, it would be unlawful for defendant to put Bibbs at a disadvantage in the competition for promotion because of his race, as well as actually to deny him the promotion for this reason. (Indeed, if an employer requires black employees to meet a higher standard, the statute is violated even if they actually meet it and get the jobs in question.) Every kind of disadvantage resulting from racial prejudice in the employment setting is outlawed. Forcing Bibbs to be considered for promotion in a process in which race plays a discernible part is itself a violation of law, regardless of the outcome of the process. At the very least, such a process "tend[s] to deprive" him of an "employment opportunit[y]." Section 703(a)(2).
 
 
 12
 778 F.2d at 1321-22.
 
 
 13
 This passage may well fit the present case. As this court and the district court make clear, up until 1964 the Extension Service was strictly segregated by race. It may have been thought for a time that such separation was defensible under the discredited "separate but equal" doctrine. (One of the problems with the doctrine was that "separate" never became "equal": here, for example, black employees were systematically paid less than white employees with the same rank and responsibility.) That possible justification disappeared with, or shortly after, the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). But overt and apparently unabashed discrimination continued in the Extension Service. When the Civil Rights Act of 1964 was passed, change remained slow in coming, and not until 1969 at the earliest did efforts begin to eliminate salary differences based on race. Even then, change did not come because the agency voluntarily recognized and accepted its own responsibilities. It came because of pressure from the federal Department of Agriculture and the federal courts, pressure that no doubt caused the Extension Service to become anxious about continued funding.[1] A salary equalization plan was finally adopted in 1973, but some racial disparities remained until 1975. Tr. 131.
 
 
 14
 The separate-but-equal system, for all its faults, at least put black employees in positions of leadership and responsibility. When that system was dismantled, leadership positions for blacks disappeared with it. With one possible exception, no black employee of the Extension Service has ever had the power to hire and fire any white employees. Tr. 70, 98. The decisionmakers in personnel matters have always been white, and decisions have been largely (and probably necessarily) subjective. Notices of vacancies--positions into which an employee might seek to be promoted--were not posted until 1972, again because of federal pressure. No black person filled the top position in a single county until about 1974, Tr. 401, another action taken in response to a federal initiative, Tr. 412. In 1977, at the urging of the Department of Agriculture, an affirmative-action plan was adopted containing goals for the employment of black people as county staff chairmen (formerly known as county agents). The plan provided that by 1982 the Extension Service would try to have three black staff chairmen. Tr. 140. There are 75 counties in Arkansas. At the time of trial, there were still only three or four black staff chairmen. Tr. 93. There are 53 specialists (White's position), apparently three of whom are black. There has never been a black section leader. Tr. 83.
 
 
 15
 This is the atmosphere and background against which White's and Talbert's claims are to be judged. That White did not apply for a promotion, or that Talbert did not protest what she regarded as unjustified criticisms of her job performance must be considered in this light. Both of them came to work with the Extension Service before 1960, when the old guard was in full control. They must have known that black employees who rocked the boat were asking for trouble. The following passage from White's direct examination has the ring of truth:
 
 
 16
 Q. Why did you take it all these years, knowing you were being discriminated against, Mr. White? Tell me why you did it?
 
 
 17
 A. It was a job security. Jobs are pretty difficult to come about in that kind of thing. Nobody was interested to file suits in that kind of thing; everybody just, "Well, we will go ahead and retire", that kind of thing. But, finally,--I could have retired, too. But I didn't feel it was right for me to retire knowing this evil existed without protesting it.
 
 
 18
 Q. Are you eligible to retire now?
 
 
 19
 A. Oh, yes, I can retire, could have retired three years ago.
 
 
 20
 Q. But you decided to be a man?
 
 
 21
 A. That's right.
 
 
 22
 Q. Finally?
 
 
 23
 A. That's right.
 
 
 24
 Tr. 65.
 
 
 25
 At the very least, it seems entirely possible that White and Talbert were "at a disadvantage in the competition for promotion because of [their] race," that they were forced "to be considered for promotion in a process in which race [played] a discernible part * * *." Bibbs v. Block, 778 F.2d at 1321, 1322. If this is in fact what happened, then we may have, as in Bibbs, a mixed motive case and Title VII has been violated, and the University should be required to prove by a preponderance of the evidence that White and Talbert would have been treated the same even if they had been white.
 
 
 26
 The University's supplemental brief, filed at our request, correctly points out that in Bibbs the district court found that race had been a discernible factor, and no such finding was made here. But neither has a contrary finding been made. This case was tried before our opinion in Bibbs was filed. We do not know what findings would have been made had the district court had the benefit of reading Bibbs.
 
 
 27
 We vacate this judgment and remand the cause for reconsideration and further findings of fact in light of Bibbs v. Block.
 
 
 
 [1]
 The Extension Service's District Director for the Southeast District, in speaking of efforts to put blacks in county leadership positions, put it this way:
 Q. And it was the U.S. Department of Agriculture that got you--to cause you to really devote some time and attention to it, wasn't it?
 A. Well, sure. The federal courts, the Department of Agriculture--and the emphasis was on correcting some problems that we had. And we were moving in that direction.
 Tr. 412.