WILKINSON, Circuit Judge,
concurring:
Poor Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It has fallen on hard times. A string of recent tragic street encounters involving the police has brought the stop-and-frisk procedure authorized in Terry under fire. But that is nothing new. The Court’s authorization of an investigative procedure on a standard less than probable cause came under fire at the time, with Justice Douglas noting in dissent that “[t]he term ‘probable cause’ rings a bell of certainty that is not sounded by phrases such as ‘reasonable suspicion.’ ” Id. at 37, 88 S.Ct. 1868. In fact, the decision was seen by some contemporaries as a capitulation to cries for law and order during the 1968 political season. Again, as Justice Douglas noted, the “hydraulic pressure” on the Court to dilute constitutional guarantees “has probably never been greater than it is today.” Id. at 39, 88 S.Ct. 1868.
There is truth in this indictment, though the truth is only partial, as truth is often found to be. It is worth recalling the three great purposes animating the Terry decision, because those, purposes are present in this case. The first purpose was simple crime prevention — the need being simply to allow police to conduct an investigatory stop before criminals visit harm upon the innocent. The Terry Court cautioned that “a rigid and unthinking application of the exclusionary rule ... may exact a high toll *97 in human injury and frustrate] efforts to prevent crime.” 392 U.S. at 15, 88 S.Ct. 1868. Here, as Judge Diaz ably recounts, a gunshot was reported during the early morning hours in the vicinity of an area known for theft, vandalism, and drug activity. J.A. 34-39. When the police arrived on the scene, they found only Foster standing in an alley between two closed businesses. Id. at 40. And after being asked if he had any weapons, Foster “began to put his right hand in his right front pocket.” Id. at 41-42. Thus, the crime-preventive stop in this case was justified, for under the totality of the circumstances the officers had reasonable suspicion that criminal acts had been committed or were in the offing.
If Terry’s first purpose of crime prevention or detection is more salient at the stop phase of an interaction, the frisk brings into relief the second and third purposes of that decision — to protect the safety of officers and suspects alike. The Court gave due consideration to the “interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.” 392 U.S. at 23, 88 S.Ct. 1868. In the present case, the district court found that the officers only frisked Foster after he reached for his pocket in response to being asked whether he was armed. J.A. 145. Of course, before the officers searched Foster they could not have known with certainty what was in his pocket. As Foster claims, he might have been “reaching for his cell phone.” Appellant’s Br. at 22. But one of the principal aims of Terry was to ensure that in circumstances such as these officers do not have to stand idly by, waiting for a bullet. As Terry put it, “it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the [suspect] is in fact carrying a weapon and to neutralize the threat of physical harm.” 392 U.S. at 24, 88 S.Ct. 1868
It may seem ironic that a decision broadening police investigatory powers could actually promote the interests of suspects in some circumstances, but that is in fact the case. The third and related purpose of Terry was to protect suspect safety by deescalating police-suspect interactions. True, the point only goes so far. As the Court acknowledged, “[i]n many communities, field interrogations are a major source of friction between the police and minority groups.” 392 U.S. at 14 n. 11, 88 S.Ct. 1868 (internal quotation marks omitted). The Court feared that suspicionless searches in particular could only aggravate hostilities and fuel resentment. In that way, frisks conducted without reasonable suspicion run the risk of turning what would otherwise be “wholly friendly exchanges of pleasantries or mutually useful information [in]to hostile confrontations of armed men involving arrests, or injuries, or loss of life.” Id. at 13, 88 S.Ct. 1868.
Among Terry’s insights, however, was that a frisk performed under the proper authority might actually help to ease tensions by dispelling suspicion and by removing an incentive for officers to use lethal or disabling force. An officer, like any human being, may be less on edge if the person in his presence is not a threat to shoot. Removing the threat affords greater room for more humane police responses. In that respect, Terry may help to protect suspects as well as the police.
To be sure, even a lawful frisk can be “an annoying, frightening, and perhaps humiliating experience.” Id. at 25, 88 S.Ct. 1868. But Terry makes clear that as great as the indignity inflicted by that procedure might be, it pales in comparison to the tragic results and inflamed reactions that follow from the use of lethal force. See id. at 13-15, 88 S.Ct. 1868. In other words, Terry may actually serve to defuse interac *98 tions such as this one if parties are able to communicate with a diminished fear that grievous consequences may result. Whéther the confrontation here would have taken a more explosive turn without the frisk is of course impossible to know. All one can say for certain is that no one was wounded or otherwise physically abused, and no loss of life ensued.
Terry was decided in the high days of the Warren Court. Chief Justice Warren himself wrote the opinion for a nearly unanimous tribunal. After Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), Terry and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), may well be among the Chief Justice’s greatest legacies. Those two decisions have come to define the parameters of modern police practice as much as any other case. Although Terry has come under fire both then and now, the case remains good law. It has stood the test of time. As the present case reminds, deservedly so.