In the Matter of SARA TINSLEY et al., Individually, as Parents, and as Presidents of Parent Teacher Associations in the Borough of Manhattan, Respondents, *v.* JOSEPH MONSERRAT et al., as Members of the Board of Education of the City of New York, et al., Appellants.

First Department, February 26, 1970.

*Alfred Weinstein* of counsel (*Stanley Buchsbaum* and *Charles D. Maurer* with him on the brief; *J. Lee Rankin, Corporation Counsel*), for appellants.

*Michael B. Rosen* of counsel (*Nancy E. Leblanc,* attorney), for respondents.

*Peter S. Herman* for Concerned Parents of East Harlem, *amicus curiæ.*

*Sheila Rush Jones* of counsel (*Caroline Heft, C. Bedford Johnson* and *Mary Marsh Zulack* with her on the brief; *Stephen L. Kass,* attorney), for East Harlem Coalition for Community Control, *amicus curiæ.*

MARKEWICH, J. This is a proceeding pursuant to article 78 of the CPLR to review the determination, made December 22, 1969, by respondents, members of the interim Board of Education of the City of New York ("Board"), whereby, as provided by section 2590-b of the Education Law (L. 1969, ch. 330, as amd. by L. 1970, ch. 3), the Board purported to promulgate a final plan of "District Boundary Lines Under the Community School District System." Petitioners are the presidents of Parents Associations of schools which were formerly in Local School District No. 5, and which, by the final plan, were moved to a new District No. 4. Petitioners' objections to the final plan were that it was violative of the statute pursuant to which adopted in that it did not "retain racially, culturally and ethnically integrated school districts in and for the Borough of Manhattan," as well as violative of both State and Federal Constitutions in denial of equal protection of the laws, and further that the Board had disregarded the statutory mandate for public hearings in advance of adoption of a final plan for community districts in the city school district. Special Term granted judgment, entered February 5, 1970, to petitioners, annulling the final plan for the Borough of Manhattan, remanding the matter, without guidelines of any kind, to the Board "for further hearing and action in accordance with the provisions of law, constitutional requirements, decisional law, and in accordance with" its opinion, and staying the election of community school board members now scheduled to be held on March 19 next. On appeal from that judgment, we reverse and dismiss the petition.

On November 17, 1969, the Board issued a "tentative districting plan defining the boundaries of the community districts" (Education Law, § 2590-b, subd. 2, pars. [b] and [c]) : "Proposed Plan for a Community School District System in New York City." That document contains a full explanation of how it came into being. It is emphasized at the outset and stressed again in the closing summary that the *tentative* plan was precisely that, italicizing the word in both places. It invites all concerned persons to "present additional suggestions either at the public hearings or in writing." It promises that all communications are to "be carefully reviewed and considered prior to the publication of the final districting plan on December 22, 1969." The various criteria required by section 2590-b to be considered (subd. 2, par. [b] ; subd 3) are set forth in quotation and paraphrase:

"1. 'No community district shall contain less than 20,000 pupils in average daily attendance in the schools under its jurisdiction'.

"2. 'nor shall the boundaries of any such district cross county lines.'

"3. 'There shall be no less than thirty nor more than thirty-three community districts.'

"4. 'The criteria to be observed * * * shall include'.

"The criteria mentioned are — common and special educational needs of the communities and children involved.

— transportation facilities.

— existing and planned school facilities.

— suitable size.

— convenient location and geographic contiguity.

— reasonable number of pupils.

— heterogeneity of pupil population.

— relationship to geographic areas for which the City * * * plans and provides services" and it goes on to comment: "Many of the criteria * * * lead to differing conclusions or tend to be mutually exclusive. Thus, New York City service areas such as health or planning often tend to be ethnically, economically or socially homogeneous. Similarly, common and special educational needs are often concentrated in a homogeneous population; yet the objective of heterogeneity of pupil population must remain an important consideration. The criteria are many and contain internal contradictions" and further: "Heterogeneity of Pupil Population. This criterion is included in the School Decentralization Law. The Board * * * mindful of the direction of other federal and state laws and administrative regulations, has followed this criterion wherever possible. Housing patterns and the impact of other forces such as non-public school attendance have often prevented solutions in keeping with this mandate, but every effort has been made to secure maximum intra-district homogeneity."

The tentative plan maps and delineates the boundaries of six proposed districts. It is found that, of the six districts, four have daily attendance averages running from 13,910 to 18,728, leaving only two districts with more than the prescribed 20,000 minimum. On this score, it is explained — and this is the root of the problem here examined: "At the present time, Manhattan has six districts exclusive of the two demonstration districts. It is not possible to retain six districts while adhering to the mandate of 20,000 pupils in average daily attendance. * * *

[T]he Board * * * has sought assurances from the Governor, the Mayor and the leaders of the State Legislature that Manhattan will be permitted to retain six community districts. These responsible leaders of government have assured the Board that they will give every consideration to this request at the next session of the Legislature, and that they do not see any great legislative barrier to the granting of this request. The Board is operating on the assumption that such a law will be enacted.'' The Board's assumption turned out to be unjustified, for there has been no such statutory change to relax the requirement as to minimum daily average pupil attendance.

As scheduled, a full hearing was held in Manhattan on December 4, 1969, at which approximately 700 attended, of whom about 140 submitted proposals. The statutory deadline for publication of a final plan (§ 2590-b, subd. 2, par. [c]), December 22, arrived, and the final plan was published on that date, presenting five districts, each over the 20,000 daily attendance minimum, the new District 4 — focal point of this litigation — by a margin of 301. It is explained in the final plan: '' The legal requirement of a minimum average daily attendance of 20,000 pupils in each community district represents an inflexible mandate which has proved to be a serious block to many of the suggestions for districting. The tentative plan proposed, for example, that the Borough of Manhattan retain its existing six school districts even though four of them did not reach the required average daily attendance. This proposal met with vigorous opposition. It was pointed out that under the original proposal, one of the Manhattan districts would have only about half the average daily attendance of a number of Brooklyn districts and less than half the average daily attendance of one of them. Many speakers at the hearings and many groups at subsequent meetings asked for special legislative action to meet their own legitimate requests, using the Manhattan situation as a precedent. They stated that if an exception to the legal mandate were made for Manhattan, other exceptions should be made for other boroughs. Counsel also advised that such an exception might well place the entire districting plan in legal jeopardy. Therefore, it was decided to adhere to the mandate of 20,000 minimum average daily attendance without exception '' and further: '' The problems of attempting to reduce the number of districts from six to five have been great indeed, and no solution appears to be without some serious objection. The concentration of public school pupils in three relatively small geographic areas — Harlem, East Harlem and the Lower East Side — has tended to compound the difficulties. Many different

district groupings have been reviewed and analyzed. The present plan, which has the support of the majority of the Board of Education, does not pretend to be perfect; but it seems to combine the necessities of the law with the greatest consideration for the needs of the children and the desires of the community. It appears to represent the most reasonable compromise between the Board's desire to adhere to the principle of ' minimal change ' and the criteria contained in the law, while being responsive to the many requests for change. Old District 6 (new District 5) will lose five of the schools in its southwestern corner (Central Harlem North) to new District 4, in order to raise the average daily attendance of the latter district above the legal minimum of 20,000 pupils.''

It is the contention of petitioners as concluded by Special Term '' that the single hearing on the Proposed Plan was not a real hearing, amounting to pretense because it is shown without any attempt at contradiction that it was based either on misrepresentation or hopeless expectation of new legislative action enabling redistricting which would comply with the guidelines laid down in '' the subject statute. Misrepresentation there certainly was not; the plan went out of its way to point out the difficulty. Nor could the Board's wishful thinking be deemed deception of any kind. If anything, the Board's statements underscored the absolute necessity of a five-district plan, for the tentative plan served clear notice of its own infirmity. Nor does the difference between the two plans require a new hearing, for one of the main purposes of such a hearing is to solicit suggestions for and possibly produce change in a proposal. While it is said — and this is true — that no legally permissible *plan* was submitted prior to the hearing, the entire *subject* was submitted for discussion at the hearing. The statute requires no further hearing than that which was provided, and it appears that that was accorded fully and in good faith. There was no basis whatever in any action taken by the Board to justify Special Term's reference to the adoption of the final plan as '' surreptitious.'' What is actually sought by the opponents of the final plan is a new opportunity to attack it. A new hearing would accomplish no more than to permit them to state again, by way of opposition to the final plan, what they had to say in support of the abandoned tentative plan.

It becomes readily apparent from the quoted excerpts that the final plan was arrived at by constraint of the statute's inflexible mandate in respect of the minimum pupil population of a district. Special Term speaks of a requirement of '' maximum [a word not used in the statute] heterogeneity '' as though that

transcends all other criteria. It is merely one of a set of criteria, some of which patently do not admit of the exercise of discretion (i.e., county lines, maximum and minimum number of districts, pupil population), and others which lend themselves more or less readily to weighing and balancing, and accommodation of one criterion to another. To accomplish heterogeneity at the expense of every other consideration might conceivably result in that very gerrymandering of which Special Term has accused the Board, and which a mere glance at the map shows not to exist. It is not shown that there was any other transfer of schools possible that would result in a less homogeneous district. It is particularly noted that there has been no change of school for any pupil because the school zone lines remain intact, and the feeder patterns from lower to upper schools are also left as they were before. No school has been moved from one district to another for the purpose of interfering with heterogeneity or to accomplish homogeneity. Although an attempt is made in the papers to demonstrate the opposite, it is not shown that any child will be deprived by transfer of salutary intra-district activity, or that the quality of his education is liable to suffer in any way.

So much for any intimation that the Board's plan violates the constitutional mandate that there be equal protection of the law to all. The landmark decision in *Brown* v. *Board of Educ.* (347 U. S. 483) has not been violated. The educational policy of the State of New York, as stated by the Regents of the University, has set its face against both *de facto* and *de jure* segregation (" Integration and the Schools ", State Education Department, 1968, 1969); it has not been violated here. The action taken by the Board to achieve heterogeneity is a far cry from the inaction of the Los Angeles Board of Education, so found by the California Superior Court (*Crawford* v. *Board of Educ. of Los Angeles,* Feb. 11, 1970). Neither the plan nor the statute is repugnant to the Constitution, unless it be believed, of which there is not a shred of evidence, that the reasonable administrative device of a minimum pupil population has been employed for the purpose of achieving segregation!

Although it is a less than perfect piece of legislation, the subject statute sets up reasonable and proper procedures and standards. It is the concern of the Legislature, not the court, to legislate. There are, no doubt, criticisms that may be leveled at the Board from educational and the administrative points of view, but, as long as the Board has exercised its discretion within

its statutory powers, it is the Board's concern, not the court's, as to how this should be done.

The Board has fully complied with statute, and its determination fails none of the tests set forth in CPLR 7803. The judgment should therefore be reversed on the law, the stay of the election vacated, and the petition dismissed, without costs or disbursements.

STEVENS, P. J. (dissenting). I dissent and vote to affirm. I agree the law is constitutional. However, knowingly presenting a tentative plan which is violative of the law (i.e., a plan for less than the required 20,000) is tantamount to the presentation of no plan at all. While the announcement of the proposed plan did stress its tentative nature and express hope for some favorable action by the executive and legislative bodies, the fact is that no legally permissible plan was submitted for discussion. Moreover, by virtue of the statutory timetable it was obvious that no meeting of the Legislature could be held unless specially called. Nothing appears to indicate that there reasonably could have been such an expectation.

McGIVERN and STEUER, JJ., concur with MARKEWICH, J.; STEVENS, P. J., dissents in opinion.

Judgment reversed on the law, without costs and without disbursements, the stay of the election vacated, and the petition dismissed.