466 F.2d 890
 Deborah A. NORTHCROSS et al., Plaintiffs-Appellees,
v.
BOARD OF EDUCATION OF the MEMPHIS CITY SCHOOLS et al.,
Defendants-Appellants.
Deborah A. NORTHCROSS et al., Plaintiffs-Cross-Appellants,
v.
BOARD OF EDUCATION OF the MEMPHIS CITY SCHOOLS et al.,
Defendants-Cross-Appellees.
 Nos. 72-1630 and 72-1631.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 29, 1972.
 
 Jack Petree, Evans, Petree, Cobb & Edwards, Memphis, Tenn., for appellant, cross appellee; Ernest G. Kelly, Jr., Memphis, Tenn., on brief.
 William E. Caldwell, Ratner, Sugarmon & Lucas, Memphis, Tenn., Norman J. Chachkin, New York City, for appellees, cross appellant; Louis R. Lucas, Ural B. Adams, Jr., Ratner, Sugarmon & Lucas, Memphis, Tenn., Jack Greenberg and James M. Nabrit, III, New York City, on brief.
 Before WEICK, CELEBREZZE and PECK, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 These appeals represent another installment of an already lengthy serial: "The Desegregation of the Memphis Public School System." The initial chapter of this story was written in 1960 when Plaintiffs first sought to apply the principles of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [Brown I] and 349 U. S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) [Brown II] to Memphis' de jure segregated school system. Since that time various aspects of this desegregation suit have been before the United States District Court for the Western District of Tennessee, this Court and the United States Supreme Court.
 
 
 2
 Most recently, pursuant to our remand (444 F.2d 1179 [1971]) the District Court has reconsidered its previously adopted desegregation plans in light of the principles announced by the Supreme Court in Swann v. Charlotte- Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and its companion cases: Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L. Ed.2d 586 (1971); McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); Moore v. Charlotte-Mecklenburg Board of Education, 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971). As a result of this reassessment the District Court determined that more intensified desegregation efforts were required in Memphis. In April, 1972, after holding extensive hearings, the District Court ordered into effect a new plan which would, for the first time in the history of this suit, require the transportation of children as part of an effort to eliminate "root and branch" the vestiges of the dual school system in Memphis. The plan is to be operational by the start of the 1972-73 school year.
 
 
 3
 Both defendants and plaintiffs have appealed from this latest order of the District Court. This Court granted a stay of that order pending our decision in the cases. Mindful of the need for speedy implementation of appropriate desegregation orders,[1] however, we also granted expedited hearings in connection with such appeals. Northcross v. Board of Education of Memphis City Schools, 463 F.2d 329 (Cir., decided June 2, 1972; rehearing en banc denied, July 5, 1972.)
 
 
 4
 In its appeal, the defendant school board asserts that it has achieved the constitutionally required unitary school system or will shortly attain such unitary system as a result of minor changes to be effected in its student assignment plans. The School Board therefore asserts that the new plan adopted by the District Court in April, for September, 1972 implementation, imposes an unnecessary burden upon it and the school children within its system. It also contends that the busing ordered by the District Court "is wrong" because such busing is harmful to the interests which the Board asserts Brown I and Brown II sought to further.
 
 
 5
 In their appeal from the District Court's order the plaintiffs complain that the new plan adopted by the District Court does not meet the requirement of Green v. County School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689 (1968), that any desegregation plan adopted be one which "promises realistically to work, now." (emphasis in the original).
 
 
 6
 The Memphis school system is one of the largest in the nation. When this suit was begun in 1960 the schools of the system were segregated by law despite the Supreme Court's rulings in Brown I and Brown II, handed down years earlier. As a result of decisions handed down by the federal courts in connection with this suit the School Board adopted several plans for the desegregation of the Memphis schools in the period subsequent to 1960. The effectiveness of these plans can be gauged by a quick look at the "vital statistics" of the Memphis system as it now exists.
 
 
 7
 In the 1971-72 school year some 145,581 students attended classes within the school district. Of these children 53.6% were black and 46.4% were white. The School Board operated 162 schools in that year. In 128 of these schools, students of one race comprised 90% or more of the schools' total enrollment, despite the near equality in the number of black and white children in the system as a whole. 47 schools (29% of the total) had student populations which were entirely black or white.
 
 
 8
 The present racial distribution has been the result of an assignment plan essentially based on geographic zoning and the "neighborhood school" concept. Such assignment plan became fully operational in 1966 when overt assignment by race was finally abandoned with respect to all grades. The attendance zones have been modified several times since 1964 by court order in an effort to increase the degree of integration which could be achieved within the system. During this past year minority to majority transfers within the system were prohibited.
 
 
 9
 It is the defendant School Board's contention that notwithstanding the fact that some 79% of its schools have an essentially monolithic racial structure it has satisfactorily cured the violation of law involved in its past de jure segregation and has, in fact, established a unitary system. We cannot accept this contention.
 
 
 10
 As recently as 1970 the Supreme Court affirmed the District Court in its finding that Memphis was not a unitary school system. Northcross v. Board of Education of the Memphis City Schools, 397 U.S. 232, 235, 90 S.Ct. 891, 25 L. Ed.2d 246 (1970). While additional faculty integration has occurred since the date of that decision the continued pattern of racial separation with respect to student assignment convinces us, as it did the District Court, that the dual system has not yet been eliminated in Memphis.
 
 
 11
 We recognize, of course, the Supreme Court's caution that the existence of "some small number of one-race or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). We cannot believe that this language, - obviously designed to ensure that tolerances are allowed for practical problems of desegregation where an otherwise effective plan for dismantlement of the dual system has been adopted-was intended to blind the courts to the simple reality that a formerly de jure segregated system has not dismantled its dual system when 87% of its black students still attend one-race schools.
 
 
 12
 Even were we to assume that the existence of the large number of one-race schools in this case is not a per se indication that the Memphis Board has failed to eliminate its dual system, there is still a presumption that such is the case under Swann, 402 U.S. 1, 26, 91 S. Ct. 1267. To overcome this presumption according to the Supreme Court, the School Board would have to demonstrate that at the very least its remaining one- race schools are not in any way the product of its past or present discriminatory conduct. It is clear that the School Board has not met that burden in this case.
 
 
 13
 The Board maintains that the present one-race schools are attributable to the pattern of residential segregation within the Memphis area. Evidence taken at a 1971 hearing held with regard to this matter demonstrated, however, that through a pattern of school location decisions, selective construction and systematic over and under utilization of school buildings the racially neutral geographic zone assignments formulated with court approval have been undermined and made to serve the cause of continued segregation in Memphis. The District Court found that such conduct by the School Board, continuing up until the time of the 1971 hearing itself had contributed "to the establishment of the present large number of one race schools . . . ." Our independent review of the evidence leads us to conclude that the District Court's findings were not clearly erroneous, and in fact, represent an accurate and realistic view of the factors responsible for the present racial pattern in the Memphis City schools.
 
 
 14
 It is thus clear that far from having achieved a unitary school system the Board has helped to perpetuate the old dual system.[2] Under these circumstances there can be no doubt that the District Court was under an obligation to order the adoption of a plan providing for further desegregation. Since many of the one-race schools are clearly the result of discriminatory actions of the School Board there can be no doubt that under any interpretation of Swann the elimination of such schools must be one of the objectives of any appropriate desegregation plan.
 
 
 15
 In adopting such plan the District Court was not bound to employ a system which merely would be racially neutral in operation. "The objective is to dismantle the dual system," Swann, 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, and "[t]he measure of any desegregation plan is its effectiveness." Davis v. School Commissioners of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292 (1971). Given such a measure:
 
 
 16
 "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a "loaded game board", affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral. Swann, supra 402 U.S. at 28, 91 S.Ct. at 1282.
 
 
 17
 Recognizing the applicability of these comments to the Memphis situation the District Court went beyond the mere gesture of requiring that future construction, location and utilization decisions be truly neutral. It required affirmative action including pairing, the alteration of some zone lines and the transportation of school children to counter the observed-and the unobservable-results of past School Board enforced segregation.
 
 
 18
 The School Board does not contest the fact that any further substantial desegregation cannot be accomplished without the transportation of school children; nor, as discussed in the preceding paragraphs is there any reason to believe that such further desegregation is not required. Nevertheless the School Board opposes the use of busing in this case. Its position is simple; the use of compulsory busing for desegregation purposes is unwise and counterproductive. In short, the School Board argues, busing for the purposes of desegregation "is wrong."[3]
 
 
 19
 The Supreme Court has, of course, come to the opposite conclusion in a recent unanimous decision, holding that "bus transportation" is one "tool of desegregation" which school authorities may be required to use. Swann, supra, 402 U.S. 1, 30, 91 S.Ct. 1267." Recognizing this to be the holding of Swann, Defendants nevertheless suggest that we come to a contrary conclusion on the basis of a single piece of much criticized sociological research,[4] the conclusions of which are, by its own terms, inapplicable to the Southern school pattern.[5] It would be presumptuous in the extreme for us to refuse to follow a Supreme Court decision on the basis of such meager evidence. Swann is controlling and requires us to sanction the use of bus transportation as a tool of desegregation when, as here, such busing is necessary to accomplish the dismantling of the dual system and its use does not pose intolerable practical problems.
 
 
 20
 With respect to this latter point we note that the most serious practical problem which busing commonly presents-that of requiring children to spend an excessive amount of time on the buses-is not a factor in this case. Under the plan adopted by the District Court the maximum time to be spent on the buses by any child is 34 minutes- slightly less than the maximum time involved in the Swann case and there found acceptable. See 402 U.S. at 30, 91 S.Ct. 1267.
 
 
 21
 The only other practical problem which has been raised by the School Board is its lack of familiarity with the administration of a transportation program. It is true that while the Board has used buses in recently annexed areas pending the construction of new schools, it has not used them on a regular basis within the school system proper. This lack of experience, while perhaps a factor of marginal significance to be considered in creating a timetable for implementation of any busing program surely cannot be allowed to bar entirely the use of such program where busing is the only effective means of accomplishing the Constitutionally required job of desegregation.
 
 
 22
 Under the circumstances of this case we believe Defendants' objections to the implementation of the plan adopted by the District Court are without merit.
 
 
 23
 Plaintiffs too have objected to the District Court's overall decision, however. They assert that the District Court erred in rejecting plans which could have provided for more desegregation faster. Plaintiffs point out that the present plan will still leave 80 of Defendant's 162 schools in the one-race status at the close of the '72-73 school year. They contest the accuracy of the District Court's finding that the more effective plans submitted to it would prove impractical. At the same time Plaintiffs raise these objections, however, they acknowledge that at this late date no more effective desegregation plan could be implemented for the beginning of the 1972-73 school year. Since they also recognize that the District Judge accepted the need for further desegregation in the future they request only that this Court direct the District Court to prepare a timetable for further desegregation. We believe such request is reasonable. It will allow the implementation of the present plan unimpeded by procedural wrangles, while providing an opportunity for the District Court to arrive at a final plan which is effective, "feasible and pedagogically sound." See Robinson v. Shelby county Board of Education, 442 F.2d 255, 258 (6th Cir. 1971). (Opinion of McCree, Judge.)
 
 
 24
 Accordingly we affirm the order of the District Court in its entirety, but with the additional instruction that it prepare a definite timetable providing for the establishment of a fully unitary school system in the minimum time required to devise and implement the necessary desegregation plan.
 
 
 25
 Upon entry of this decision the stay heretofore granted by this Court shall be dissolved and the order of the District Court implemented forthwith.
 
 
 26
 WEICK, Circuit Judge (dissenting).
 
 
 27
 The order of the District Court which the Court has just affirmed requires the daily busing of about 14,000 school children, but this is just the prelude to a great, massive busing program, for which the Court directs the District Court to "prepare a definite timetable providing for the establishment of a fully unitary school system in the minimum time required to devise and implement the necessary desegregation plan."[1]
 
 
 28
 The District Court has characterized the plan providing for the busing of 14,000 children as "minimal". Indeed it is minimal when compared with an alternate plan under consideration by that Court, which alternate plan provides for the busing of 39,085 children, and plaintiffs' plan which they are urging the Court to adopt, providing for the busing of 61,530 children.
 
 
 29
 The cost of all of this program will run into millions of dollars, not only for the buses but also millions of dollars annually to operate them. The Court does not determine where all of the money is to come from, or whether it is practical or feasible. It is assumed that this burden will be thrust upon the Memphis taxpayers.
 
 
 30
 Nor do we know what effect the massive busing programs will have on the educational programs now in existence, on the educational achievement of the children who attend public schools, or on the constitutional rights of the children (if they have any) of both races who do not want to be assigned away from the neighborhood schools where they are attending, which assignments are made solely because of the color of their skin, and by which assignments the children will be bused to strange and unfamiliar surroundings in order to achieve a racial quota or mixture in each and every school in Memphis.
 
 
 31
 Immediately upon the filing of the appeal, plaintiffs moved that the appeal be expedited. We granted the motion and assigned the appeal for oral argument on July 15, 1972, during our summer recess. It now appears that this is a piecemeal appeal or an appeal from an interim order, and that the massive busing orders which are being requested are not supposed to become effective until the 1973-74 school year. We stayed the order of the District Court pending appeal.[2]
 
 
 32
 The history of the case and the developments in the law appear in the reported decisions of this Court in Northcross v. Board of Educ., 302 F.2d 618 (6th Cir. 1962); 333 F.2d 661 (6th Cir. 1964); 397 U.S. 232, 90 S.Ct. 891, 25 L. Ed.2d 246 (1969), and 444 F.2d 1179 (6th Cir. 1971). Since adoption of the desegregation plan no student has been excluded from any school because of race or color, except in compliance with a transfer plan ordered by the Court.
 
 
 33
 Upon the last remand of the case by this Court for reconsideration in the light of Swann v. Board of Educ., 402 U.S. 1, 91 S.Ct. 1267 (1971), and related cases, the District Court conducted an evidentiary hearing and filed the two opinions which are the subject of review in the present appeals.
 
 
 34
 In the December 10th opinion of the District Court, the school system is described as follows:
 
 
 35
 "During the current school year (1971-72), the defendant system is based upon a curriculum arrangement of elementary schools of grades 1 through 6, junior high schools of grades 7 through 9 and high schools of grades 10 through 12. There are 145,581 pupils, 53.6% of them are black and 46.4% of them are nonblack (hereinafter referred to as white). Percentagewise, 87.7% of the blacks are in 90% or more black schools and 76.4% of the whites are in 90% or more white schools. There are 162 schools, 67 of them are 90% or more black and 61 of them are 90% or more white (29 are all black and 18 are all white). Percentagewise, 37.6% of the 162 schools are 90% or more white and 41.3% are 90% or more black.
 
 
 36
 "Pursuant to previous orders of this Court the present pupil assignment phase of the defendant system's desegregation plan is basically a geographic zone plan with minority to majority transfers prohibited.
 
 
 37
 "The proof unquestionably establishes that the one-race schools do follow racial housing patterns."
 
 
 38
 Substantial evidence was offered tending to prove that these racial housing patterns were not peculiar to Memphis, but that such housing patterns existed in other cities throughout the country, irrespective of the type of school sytem in operation (whether de jure or otherwise). This was testified to by Dr. Robert Guthrie. In his book on "Negroes In Cities," Dr. Karl Taeuber states that residential segregation exists "regardless of the character of local laws and policies and regardless of other forms of discrimination." He said substantially the same thing in his article, "Residential Segregation", in the August, 1965 issue of Scientific American:
 
 
 39
 "No elaborate analysis is necessary to conclude from these figures that a high degree of residential segregation based on race is a universal characteristic of American cities. This segregation is found in the cities of the North and West as well as of the South; in large cities as well as small; in nonindustrial cities as well as industrial; in cities with hundreds of thousands of Negro residents as well as those with only a few thousand; and in cities that are progressive in their employment practices and civil rights policies as well as those that are not." (Ex. 81, Page 14).
 
 
 40
 It seems to us that this evidence ought to carry great weight on the important issue as to whether the Board was responsible for the creation or maintenance of the residential patterns of the city and whether the entire burden for the integration of the races should be placed upon the public school system and the school children.
 
 
 41
 In Bradley v. School Board of City of Richmond, 462 F.2d 1058 (4th Cir., decided June 5, 1972), the Court said:
 
 
 42
 ". . . [T]he root causes of the concentration of blacks in the inner city are simply not known . . . ."
 
 
 43
 and
 
 
 44
 "Whatever the basic causes, it has not been school assignments, and school assignments cannot reverse the trend."
 
 
 45
 Since 1960 the Board of Education has spent an average of $10,000,000 per year on school construction. Some schools have vacant spaces, whereas others are over-filled with students. This condition can easily be remedied. It had been the established practice of the Memphis Board of Education and of other Boards of Educatrion throughout the County to locate schools in areas of the residences to be served. The neighborhood school system has existed throughout America and its value only recently has been the subject of bitter attack in desegregation cases. The District Court now requires court approval of any new school construction.
 
 
 46
 I disagree with the District Court that the accommodation of the Board to the housing patterns made it or its predecessors an active partner in discrimination. The record shows that on occasions the Board interceded with housing authorities in an effort to persuade them to locate structures so as either to approximate integration or retard segregation. There has been mobility of both white and black families which the Board cannot very well control.
 
 
 47
 Three plans were considered by the District Court. Plan A, which the Court adopted, provides maximum use of pairing of adjacent or near by schools without transportation of students, changing some zone lines of adjacent or near by schools, closing some schools, plus the minimum use of transportation of students by clustering or pairing non-contiguous zones, or other methods.
 
 
 48
 The transportation, which the Court characterizes as minimum, provides for busing of about 14,000 pupils, just as a starter. Memphis does not have a history of transportation of students. The Board estimates this will require a capital expenditure of $1,664,192 for buses, plus an annual operating cost of $629,192. It had an estimate of $744,330, annually, from one contractor. The annual cost of transportation would be about fifty dollars per pupil. The Court was of the view that adoption of Plan A would provide the Board "with an opportunity to observe the best ways and means for implementing further desegregation in the future."
 
 
 49
 Plan B was ordered by the Court as an alternate, to desegregate all schools necessary so that "no school will have a minority race of less than 30%." It would require the busing of 39,085 pupils, at a cost of $1,783,490, annually, or a total initial investment as estimated by the Board in the amount of $3,924,000. This, of course, is the "quota" system.
 
 
 50
 Plaintiffs submitted a proposed plan prepared by their expert, Dr. Gordon Foster, which plan would require minority races to be present in each and every public school in the system, regardless of where the children live. It would require the daily busing of 61,530 pupils. Plaintiffs have submitted estimated operating costs of $2,354,220, $2, 431,710, or $3,463,100, depending on whether the Board buys its own buses, and if so, whether diesel or gasoline buses are used, and whether the buses are provided by contract carriers.
 
 
 51
 Memphis has a large concentration of black population in the inner city, with smaller numbers on the outskirts. The only way these residential patterns can ever be dismantled is by forced or induced busing of black and white children away from their neighborhood schools to other schools located some distance therefrom. It is claimed that all of this is necessary in order to achieve integration of the races in the public schools.
 
 
 52
 But what about the black and white children who do not want to be bused away from their neighborhood schools? Do they have no constitutional rights? It would appear that this issue has been given scant consideration by the Courts. Yet, merely because a child's skin is white or black, he is on that account, and without his consent or that of his parents, assigned to a particular school, and bused away from his neighborhood school in order to achieve a mixture of the races in each school in the city. I submit that the Constitution requires no such thing.
 
 
 53
 It is not claimed that these unfortunate children, who are the victims of induced busing, have committed any offense. And we are living in a free society in which one of the privileges is the right of association.
 
 
 54
 The average American couple who are raising their children, scrape and save money to buy a home in a nice residential neighborhood, near a public school. One can imagine their frustration when they find their plans have been destroyed by the judgment of a federal court.
 
 
 55
 The elimination of neighborhood schools necessarily interferes with the interest and participation by parents in the operation of the schools through parent- teachers' associations, interferes with activities of children out of school, and interferes with their privilege of association, and it deprives them of walk in schools. It can even lower the quality of education. "School Desegregation After Swann," Univ. of Chicago Law Review, Vol. 39 No. 2, Winter 1972, p. 444.
 
 In Brown II, the Court said:
 
 56
 "The opinions . . . declaring the fundamental principle that racial discrimination in public education is unconstitutional, are incorporated herein . . . ." (349 U.S. 294, 298, 75 S.Ct. 753, 755 (1955).
 
 
 57
 The effects of prior discriminatory practices can hardly be deemed to exist when children are permitted to select the schools they desire to attend and are furnished free transportation to that school at public expense.
 
 In Alexander the Court required:
 
 58
 ". . . unitary school systems within which no person would be effectively excluded from any school because of race or color." Alexander v. Holmes Co. Bd. Educ., 396 U.S. 19, 20, 90 S.Ct. 29 (1969). (Emphasis added).
 
 
 59
 In Memphis today no person is excluded from any school because of race or color.
 
 
 60
 However, it is contended that discrimination of individuals and of public and private agencies either caused or contributed to cause the concentration of black population in the inner city. The fact should not be overlooked that socioeconomic conditions were involved, importantly and principally, in the concentration. The burden of elimination of all of the ills of society should not, in all fairness, be visited upon the public school systems and upon innocent school children who are not responsible for these conditions and who are not represented and cannot protect themselves. Nor should the children be used as pawns.
 
 
 61
 As Chief Justice Burger well stated in Swann:
 
 
 62
 "The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage." (Swann v. Board of Educ., 402 U.S. 1, 22, 91 S.Ct. 1267, 1279 (1971).
 
 
 63
 In remedying discrimination against the plaintiffs, we ought not to discriminate against other innocent children whose constitutional rights, with those of the plaintiffs, are equal.
 
 
 64
 Boards of Education have no jurisdiction over discrimination by private individuals or by public or private agencies. Moreover, they are not parties to this case. Adequate remedies exist under the various Civil Rights Acts (1866, 1964, and 1966) and under the Fourteenth Amendment, to remedy discrimination in the rental or purchase of homes. Jones v. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). For discrimination in emploument practices see 42 U.S.C. Sec. 2000e et seq.; and for voting rights, see 42 U.S.C. Sec. 1971 et seq.
 
 
 65
 We considered this situation in Deal v. Cincinnati Bd. of Educ., 369 F.2d 55 (6th Cir. 1965), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), affirming 244 F.Supp. 572 (S.D. Ohio, 1965), where we said:
 
 
 66
 "Because of factors in the private housing market, disparities in job opportunities, and other outside influences, (as well as positive free choice by some Negroes), the imposition of the neighborhood concept on existing residential patterns in Cincinnati creates some schools which are predominantly or wholly of one race or another. Appellants insist that this situation, which they concede is not the case in every school in Cincinnati, presents the same separation and hence the same constitutional violation condemned in Brown. We do not accept this contention. The element of inequality in Brown was the unnecessary restriction on freedom of choice for the individual, based on the fortuitous, uncontrollable, arbitrary factor of his race. The evil inherent in such a classification is that it fails to recognize the high value which our society places on individual worth and personal achievement. Instead, a racial characterization treats men in the mass and is unrelated to legitimate governmental considerations. It fails to recognize each man as a unique member of society.
 
 
 67
 "In the present case, the only limit on individual choice in education imposed by state action is the use of the neighborhood school plan. Can it be said that this limitation shares the arbitrary, invidious characteristics of a racially restrictive system? We think not. In this situation, while a particular child may be attending a school composed exclusively of Negro pupils, he and his parents know that he has the choice of attending a mixed school if they so desire, and they can move into the neighborhood district of such a school. This situation is far removed from Brown, where the Negro was condemned to separation, no matter what he as an individual might be or do. Here, if there are obstacles or restrictions imposed on the ability of a Negro to take advantage of all the choices offered by the school system, they stem from his individual economic plight, or result from private, not school, prejudice.[4] We read Brown as prohibiting only enforced segregation."
 
 
 68
 Subsequently we considered Deal again and affirmed the principles therein set forth. Deal v. Cincinnati Bd. of Educ., 419 F.2d 1387, cert. denied, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). Twice the Supreme Court had opportunity to review Deal and twice it declined to do so.
 
 
 69
 Deal, of course, dealt with alleged de facto segregation in norethern schools. But, as we have shown, there is concentration of blacks in the inner cities in the north the same as it exists in the south. The same rule of law should apply throughout the country.
 
 
 70
 Also, we are not unmindful of programs of the Federal Government and of industry for job training and employment opportunities for minority groups. As these programs become more effective the black population will be able to mover into better living quarters and neighborhoods, and their children will attend schools in these neighborhoods.
 
 
 71
 It should be pointed out that there is quite a difference between voluntary busing and forced or induced busing, in the effect it has on the children and their parents. Forced busing is not much different than segregation under sanction of law, referred to in Brown I, as generating feelings of inferiority on the part of the children (347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873) and frustration on the part of the parents.
 
 
 72
 There is also a considerable division of opinion in the black community over enforced busing.[3]
 
 
 73
 We have approved transportation of children to effect the transfer policies adopted by the Court, and in connection with the "pockets and coves." Where certain school buildings are overcrowded and others have vacant spaces busing should be provided to the children of either race so that all of the school facilities will be used, giving preference to minority groups desiring to be transferred to such schools from schools in which they are in the majority.
 
 
 74
 We do not read Swann and related cases as holding that there should be racial quota or mixture in each public school of the city, and certainly not in those areas where the children, on account of their economic status, would never have attended those schools if there had been no state imposed segregation.
 
 
 75
 Also, I am not unmindful of the difficult and trying experiences of the District Judge whose opinions in the past have been under attack by the plaintiffs. This is the first appeal taken by defendants. I believe the District Judge has done well in the handling of this case, and the decisions which he has made he felt were compelled by decisions either of the Supreme Court or of this Court. The law in this field has been complex as well as confusing to lawyers, judges and legal scholars. This situation still persists.[4]
 
 
 76
 Part of the difficulties experienced by the District Judge in the present case were the extreme positions adopted by the plaintiffs and the defendants. The District Judge found that the plan proposed by the plaintiffs (prepared by Dr. Gordon Foster) to be put into effect not later than the 1973-74 school year, was unrealistic and that Dr. Foster had little experience or knowledge as to Memphis schools.[5] We agree.
 
 
 77
 Nor do we think that Plan B is necessary or required under the evidence in this case. In our judgment it is not necessary to have racial mixture in every school in the city. The cost is always a factor to be considered. Funds for operation of the 1972-73 school year have already been appropriated by the city. The School Board has no authority to levy taxes or appropriate money. If Plan A is now put into effect it may adversely affect the present year's school program.[6]
 
 
 78
 In our opinion, the school system cannot be faulted for conditions resulting from the residential patterns of Memphis, and the Board ought not to be charged with the duty of their entire elimination. In order to have a unitary system it should not be necessary to bus 14,000 school children.
 
 
 79
 The Court should also consider the claims of children who contend that their constitutional rights have been violated by the busing plan.
 
 
 80
 Further, consideration should also be given to Title VIII of Education Amendments of 1972.[7] 
 
 
 81
 The Education Amendments of 1972 contain a prohibition against the use of appropriated funds for busing. This may seriously interfere with the Board's obtaining any federal funds. The District Court found that the funds had already been appropriated by the City for the 1972-73 school year. It is therefore obvious that if 14,000 students have to be bused other programs will have to be curtailed or even abolished, and the children will suffer. It is also very unlikely that the Board will be able to obtain any funds from the state for busing.
 
 
 82
 Memphis is probably no different than other large, harried cities throughout the nation who are experiencing real difficulty in obtaining sufficient funds to pay for all the services which they are required to render, including relief to the indigent. These cities are unable to obtain sufficient funds from taxation, as their citizens are already being taxed by the states and the cities as much as the traffic will bear. So they are all hopeful of persuading the Federal Government to share tax revenues, but this will require Congressional action.
 
 
 83
 These are all matters which the District Court has a right to consider on the issue whether any plan is practical or feasible. In my opinion the busing of 14,000 school children is neither practical nor feasible.
 
 
 84
 Plaintiffs have filed a motion to strike the reply brief of the Board, containing an article entitled "The Evidence On Busing," by David J. Armor, a sociologist, which article seems to explode some existing concepts on the value of busing. Plaintiffs' position is that it was not the proper subject of a reply brief, and for the Court even to consider it would deprive them of their due process rights. But in Brown I the Supreme Court not only cited, but relied heavily on, articles written by sociologists, and it was not considered that the Supreme Court was depriving the Board of Education of its Fourth Amendment rights.
 
 
 85
 On the remand, in my judgment the District Court ought to consider this article and any response thereto which the plaintiffs may care to make, so that there will be no question but that plaintiffs have not been deprived of their constitutional rights.
 
 
 86
 I see no necessity to vacate our stay order as it extended only pending appeal, and automatically expired upon the filing of the decision of the Court.
 
 
 87
 Nor do I see any necessity at this time for ruling on the constitutionality of Section 803 of the Education Amendments of 1972, as this would be premature.
 
 
 88
 I would remand for further consideration. No costs allowed.
 
 
 
 [1]
 See Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Carter v. West Feliciana Parish School Board, 396 U.S. 226, 90 S.Ct. 518, 24 L.Ed.2d 549 (1969); cf. Green v. County School Board of New Kent County, 391 U.S. 430, 438-439, 442, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)
 
 
 [2]
 We, like the Supreme Court in Swann, find no need to consider the relevance of discriminatory actions by other state agencies insofar as they may have affected the pattern of student assignment in the public schools. See 402 U.S. at 22-23, 91 S.Ct. 1267
 
 
 [3]
 Defendants-Appellees' reply brief in No. 72-1631 at p.2
 
 
 [4]
 Armor, "The Evidence on Busing", The Public Interest, p. 91 (Summer, 1972). The publication plans to print the scholarly critiques of the article in its next issue, according to the preface to the piece
 
 
 [5]
 Armor, supra, n. 3 at 123
 
 
 [1]
 Although it has never been very clear just what comprises a unitary school system, the plans are obviously seeking a proportionate racial mixture in each and every school in the city irrespective of the location of the children's residences
 
 
 [2]
 The stay was granted by a panel of this Court to permit consideration of substantial issues before enforcement of the District Court's judgment requiring the expenditure of large sums of public funds required even to initiate a program to furnish transportation by bus to children in the public schools in a city which previously had not furnished such transportation and which transportation was claimed by the Board to be for the purpose of achieving racial balance in the schools. Twice, all the active Judges of this Court were requested to vote on whether an en banc hearing should be held on the revocation of the stay, and each time a majority of the Judges voted "No". A dissent was filed to the refusal to grant the second request for an en banc hearing, stating among other things that the Supreme Court "told" District Judges and Appellate Judges not to grant stays in school desegregation cases. The panel granting the stay was unable to find any such decision of the Supreme Court
 "4. The District Court correctly excluded evidence of alleged discrimination in the public and private housing markets. Such discrimination is caused, if in fact it does exist, by persons who are not parties to this case and the Board has no power to rectify that situation. If appellants have any valid claim for infringement of their rights by public housing or urban renewal officials, they may obtain appropriate relief against them under the Fourteenth Amendment. With respect to private actions amounting to discriminatory practice, while there is no federal constitutional right available to appellant, they may seek relief from the State Civil Rights Commission or in the state courts, if relief is denied, under the provisions of the Ohio Fair Housing Law. Ohio Rev. Code Sec. 4112.01-.07." (369 F.2d at 60)
 
 
 [3]
 Counsel for the School Board relies on the cross-examination of plaintiff's witness, Maizelle Smith, who agreed that not quite one-half of the black parents oppose forced busing. At the National Black Political Convention held in Gary, Indiana (March, 1972), mandatory busing and school integration were condemned as racist and as preserving a black minority structure
 
 
 [4]
 "The Supreme Court 1970 Term," 85 Harvard Law Review 1 (1971); "School Desegregation After Swann, A Theory of Governmental Responsibility," Univ. of Chicago Law Review, No. 2, Winter, 1972
 
 
 [5]
 The Foster plan was also dependent on dedicated cooperation of the populace. Dr. Foster testified as a witness for plaintiffs and prepared the plan adopted by the District Court in the celebrated case of Bradley v. School Board of the City of Richmond, 462 F.2d 1058 (4th Cir. 1972)
 
 
 [6]
 In the University of Chicago Law Review article entitled "School Desegregation After Swann, A Theory of Governmental Responsibility," (Univ. of Chicago Law Review, No. 2, Winter, 1972) the author poses the question, "Whether the costs of achieving desegregation in any given situation outweigh the legal, moral and educational considerations favoring it."
 
 
 [7]
 Title VIII of Education Amendments of 1972, 86 Stat. 235, published in U.S.Law Week, Vol. 41 No. 3, July 18, 1972, provides:
 Title VII-General Provisions Relating
 To The Assignment Or Transportation Of Students
 Prohibition Against Assignment Or Transportation Of Students To Overcome Racial Imbalance
 Sec. 801. No provision of this Act shall be construed to require the assignment or transportation of students or teachers in order to overcome racial imbalance.
 Prohibition Against Use Of Appropriated Funds For Busing
 Sec. 802(a). No funds appropriated for the purpose of carrying out any applicable program may be used for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to overcome racial imbalance in any school or school system, or for the transportation of students or teachers (or for the purchase of equipment for such transportation) in order to carry out a plan of racial desegregation of any school or school system, except on the express written voluntary request of appropriate local school officials. No such funds shall be made available for transportation when the time or distance of travel is so great as to risk the health of the children or significantly impinge on the educational process of such children, or where the educational opportunities available at the school to which it is proposed that any such student be transported will be substantially inferior to those opportunities offered at the school to which such student would otherwise be assigned under a nondiscriminatory system of school assignments based on geographic zones established without discrimination on account of race, religion, color, or national origin.
 (b) No officer, agent, or employee of the Department of Health, Education, and Welfare (including the Office of Education), the Department of Justice, or any other Federal agency shall, by rule, regulation, order, guideline, or otherwise (1) urge, persuade, induce, or require any local education agency, or any private nonprofit agency, institution, or organization to use any funds derived from any State or local sources for any purpose, unless constitutionally required, for which Federal funds appropriated to carry out any applicable program may not be used, as provided in this section, or (2) condition the receipt of Federal funds under any Federal program upon any action by any State or local public officer or employee which would be prohibited by clause (1) on the part of a Federal officer or employee. No officer, agent, or employee of the Department of Health, Education, and Welfare (including the Office of Education) or any other Federal agency shall urge, persuade, induce, or require any local education agency to undertake transportation of any student where the time or distance of travel is so great as to risk the health of the child or significantly impinge on his or her educational process; or where the educational opportunities available at the school to which it is proposed that such student be transported will be substantially inferior to those offered at the school to which such student would otherwise be assigned under a nondiscriminatory system of school assignments based on geographic zones established without discrimination on account of race, religion, color, or national origin.
 (c) An applicable program means a program to which the General Education Provisions Act applies.
 Provision Relating To Court Appeals
 Sec. 803. Notwithstanding any other law or provision of law, in the case of any order on the part of any United States district court which requires the transfer or transportation of any student or students from any school attendance area prescribed by competent State or local authority for the purposes of achieving a balance among students with respect to race, sex, religion, or socioeconomic status, the effectiveness of such order shall be postponed until all appeals in connection with such order have been exhausted or, in the event no appeals are taken, until the time for such appeals has expired. This section shall expire at midnight on January 1, 1974.
 Provision Authorizing Intervention In Court Orders
 Sec. 804. A parent or guardian of a child, or parents or guardians of children similarly situated, transported to a public school in accordance with a court order, may seek to reopen or intervene in the further implementation of such court order, currently in effect, if the time or distance of travel is so great as to risk the health of the student or significantly impinge on his or her educational process.
 Provision Requiring That Rules of Evidence Be Uniform
 Sec. 805. The rules of evidence required to prove that State or local authorities are practicing racial discrimination in assigning students to public schools shall be uniform throughout the United States.
 Application Of Proviso Of Section 407 (a) Of The Civil Rights Act Of 1964 To The Entire United States
 Sec. 806. The proviso of section 407 (a) of the Civil Rights Act of 1964 providing in substance that no court or official of the United States shall be empowered to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards shall apply to all public school pupils and to every public school system, public school and public school board, as defined by title IV, under all circumstances and conditions and at all times in every State, district, territory, Commonwealth, or possession of the United States regardless of whether the residence of such public school pupils or the principal offices of such public school system, public school or public school board is situated in the northern, eastern, western, or southern part of the United States.