**NEWBURG AREA COUNCIL, INC., et al., Plaintiffs-Appellants,**

v.

**BOARD OF EDUCATION OF JEFFERSON COUNTY, KENTUCKY, et al., Defendants-Appellees.**

**John L. HAYCRAFT, et al., Plaintiffs-Appellants,**

v.

**BOARD OF EDUCATION OF LOUISVILLE, KENTUCKY, et al., Defendants-Appellees.**

**Nos. 73–1403, 73–1408.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1973.

Decided Dec. 28, 1973.

John A. Fulton, Woodward, Hobson & Fulton, and E. Preston Young, Louisville, Ky., on brief, for Bd. of Ed. of Jefferson County, Kentucky (73–1403).

Henry A. Triplett, Hogan, Taylor, Denzer & Bennett, Louisville, Ky., on brief, for Bd. of Ed. of Louisville, Ky. (73–1408).

Robert Allen Sedler, Lexington, Ky., and Thomas L. Hogan, John G. O'Mara, Louisville, Ky., on brief, for Newburg Area Council, Inc., and others (73–1403).

Darryl T. Owens, Charles J. Lunderman, Jr., Galen Martin, William Friedlander, Louisville, Ky., on brief, for John E. Haycraft, and others (73–1408).

Before PHILLIPS, Chief Judge, and McCREE and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This is an appeal from a dismissal by the district court of two class actions concerning school desegregation in Jefferson County, Kentucky. In Newburg Area Council, et al., v. Board of Education of Jefferson County, No. 73–1403, the plaintiff challenged certain practices of the Jefferson County School Board with respect to its elementary schools. Later another action, Haycraft, et al., v. Board of Education of Louisville, Kentucky, et al., No. 73–1408, was filed against the Louisville Board of Education and the Jefferson County Board of Education, seeking the desegregation of the Louisville school system with a plan that included disregarding the Louisville and Jefferson County School District boundaries. The two suits were consolidated but the Court directed separate trials as to the status of each district.

The district court dismissed both actions, holding that the Jefferson County School District and the Louisville Independent School District are unitary systems in which all vestiges of state-imposed segregation have been eliminated. The actions have been consolidated for appeal.

We decide three issues on this appeal: (1) Whether the district court erred in holding that the Jefferson County School District is a unitary system in which all vestiges of state-imposed segregation have been eliminated; (2) whether the district court erred in holding that the Louisville Independent School District is a unitary system in which all vestiges of state-imposed desegregation have been eliminated; and (3) whether a federal district court has the power to disregard school district lines within a single county in formulating a school desegregation plan.

The Jefferson County School District embraces all of Jefferson County except that portion included within the Louisville Independent School District and the Anchorage Independent School District.[1] It has close to 96,000 students, approximately 4% of whom are black. 65% of all students are bussed to the schools they attend. The Board operates 74 elementary schools, 5 middle schools, 18 combined junior and senior high schools, and 6 special schools.

Prior to the decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Board maintained a racially-segregated school system in accordance with the requirements of Kentucky law. It did not provide a high school for black students and arranged for their attendance at Central High School, the black high school operated by the Louisville Board of Education. It oper-

---

1. The Anchorage School District is a very small school district operating only one elementary school located in the southeast portion of Jefferson County. It is an all-white enclave. The plaintiffs in the *Haycraft* case sought to join the Anchorage School District and its Superintendent as parties defendant. When the district court ruled in a pretrial order that it did not have the power to cross school district lines, it dismissed the proceedings against the Anchorage District and its Superintendent. As we point out later, the Anchorage District must be rejoined in the action.

ated the Newburg Elementary school, grades 1–9. Newburg was located in the one area in the county outside of Louisville having any substantial black population. It was a pre-*Brown* black school, and has remained black until the present day. Newburg is surrounded by a number of all-white or virtually all-white elementary schools. Within a distance of three miles from Newburg, there are, in addition to Price Elementary School, which will be discussed subsequently, nine substantially white elementary schools.

In 1969 Price Elementary School was constructed within a mile of Newburg. When Price opened in 1969–70, 33.1% of the students were black. The percentage increased to 40.2% during 1970–71, to 43.9% during 1971–72, and now stands at 54.3%. It is practically an all walk-in school, with about 3% only of the pupils being bussed.

Cane Run Elementary School is located in the northwest portion of the District close to the Louisville city limits. In 1966–67 the black student population of Cane Run was 1.2%. In 1967–68 it increased to 6.2%, in 1968–69 it increased to 11.5%, in 1969–70 it increased to 25.5%, in 1970–71 it increased to 36.7% and in 1971–72 to 45.5%. In 1972–73 it stood at 49%. Cane Run was rebuilt on the same site during 1972.

The evidence shows that Newburg, Price and Cane Run contain 56% of the black elementary students in the Jefferson County School District.

The district court held that the existence of an all black school, Newburg, in the Jefferson County School District was not unconstitutional. The Supreme Court stated in Swann v. Charlotte Mecklenburg School District, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971), that the "existence of some small number of virtually one-race schools within a district is not in and of itself the mark of a system that still practices segregation."

As this Court noted in Northcross v. Board of Education of Memphis City Schools, 466 F.2d 890, 893 (6th Cir. 1972), this language in *Swann* is "obviously designed to insure that tolerances are allowed for practical problems of desegregation where an otherwise effective plan for dismantlement of the school system has been adopted." The Jefferson County School District thus has three elementary schools that either are or are rapidly becoming "racially identifiable." As stated, Newburg School, a pre-*Brown* black school, is racially identifiable, while Price and Cane Run Schools are rapidly becoming racially identifiable as black schools. The duty of the school board is to "eliminate from the public schools all vestiges of state-imposed segregation." *Swann, supra*, 402 U.S. at 15, 91 S.Ct. at 1275. Until the dual system is eliminated "root and branch," Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the school district has not conformed to the constitutional standard set forth by *Brown* nearly 19 years ago.

The Board urges that "white flight," not school board policies, has been responsible for the shift in the racial composition of the Price and Cane Run Schools. The district court found that the attendance zone for Cane Run had remained constant over the years and that as blacks moved into the attendance area, the school would naturally become "blacker," particularly since whites would "flee." Although the decisions with respect to Cane Run attendance zone and the rebuilding of Cane Run on the same site, considered alone, might not compel the conclusion that the Board fostered segregation here, its decisions with respect to Cane Run must be related to the circumstances surrounding the Newburg and Price Schools.

The evidence shows that in 1969–70 Price opened with an enrollment of 560 and a capacity of 756. Newburg, with a capacity of 1242 had an enrollment of 620. Although these schools

were underutilized, several "racially identifiable" white schools were operating with enrollments greater than capacity using either portable classrooms or operating double shifts. During the 1972–73 school year Newburg's enrollment had declined to 340, and Price's had declined to 620, while some of the nearby "white" schools were operating over capacity. The district judge found no significance in the under utilization of nearby white schools. Instead he found that the Board was trying to achieve integration in assigning some black students in the area to nearby white schools without determining why white students in the area were not assigned into Newburg and Price. All vestiges of state-imposed segregation have not been eliminated so long as Newburg remains an all black school. Where a school district has not yet fully converted to a unitary system, the validity of its actions must be judged according to whether they hinder or further the process of school desegregation. The School Board is required to take affirmative action not only to eliminate the effects of the past but also to bar future discrimination. *Green, supra,* 391 U.S. 438 n. 4, 88 S.Ct. 1689; Robinson v. Shelby County Board of Education, 442 F.2d 255, 258 (6th Cir. 1971). Since the Jefferson County Board has not eliminated all vestiges of state-imposed segregation from the system, it had the affirmative responsibility to see that no other school in addition to Newburg would become a racially identifiable black school. It could not be "neutral" with respect to student assignments at Price or Cane Run. It was required to insure that neither school would become racially identifiable.

█ A school system that has had a history of state-imposed segregation has not fully converted to a unitary system when 56% of all of its black elementary students attend three out of seventy-four elementary schools. This is particularly so when these schools are surrounded by several all-white or virtually all-white schools.

The Louisville School District is an independent school district established in accordance with the requirements of Kentucky Revised Statutes 160.160, which provides for independent school districts within a county. It is situated within the City of Louisville, a city of the first-class in Jefferson County, Kentucky, but its boundaries are not coterminous with the political boundaries of the City of Louisville.[2] Approximately 10,000 children, mostly white, live between the boundaries of the Louisville School District and the outer boundaries of the City of Louisville. The total enrollment of the Louisville School District at the commencement of the 1972–73 school year was 45,570 pupils, of whom 22,367 were white, and 22,933 were black. The trend is definitely toward "white flight." During the 1956–57 school year, there were 45,841 children enrolled of which 12,010 were black and 33,831 were white. Thus, from 1956 to the present time, the white enrollment has decreased by approximately 11,000 pupils, and the black enrollment has increased by the same number.

Prior to the decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Louisville Board of Education operated a racially-segregated school system in accordance with the requirements of Kentucky law. The Board put a plan of pupil desegregation into operation at the commencement of the 1956–7 school year. The plan consisted of geographic attendance zones with an open transfer provision. Parents were sent forms to indicate a first, second, and third choice of transfer school. In the absence of a parental transfer request, the pupils were required to attend schools within their assigned zones.

2. An independent school district's boundaries do not expand with the boundaries of the city by which it is embraced. Annexation for educational purposes must be considered independently of annexation for the expansion of the city. Thomas v. Spragens, 308 Ky. 97, 213 S.W.2d 452 (1948).

At the commencement of the 1972–73 school year, the Board was operating six academic high schools, thirteen junior high schools, and forty-six elementary schools.[3] Three of the six academic senior high schools, Central, Male and Shawnee, have between 94% and 100% black students. Central was a pre-*Brown* black school. Male and Shawnee were pre-*Brown* white schools. Two of the senior high schools, Atherton and Iroquois, have 97% and 99% white students. The sixth school, Manual, which shares a common attendance zone with Central and Male, has 40% black students. Atherton and Manual were pre-*Brown* white schools, and Iroquois was constructed after 1956.

There are thirteen junior high schools. Five of them, DuValle, Meyzeek, Parkland, Russell, and Shawnee, have between 95% and 100% black students. Four of them, Barrett, Gottschalk, Highland and Southern, have between 94% and 99.5% white students. The remaining four, Manly, Manual, Western and Woerner, have between 25% and 64% black students. DuValle, Meyzeek and Russell were pre-*Brown* black schools; Parkland, Shawnee, Bartlett, Highland, Southern, Manly, Manual, Western and Woerner, were pre-*Brown* white schools. Gottschalk was constructed after 1956.

There are forty-six elementary schools. Nineteen have between 82% and 100% black students. Twenty-one have between 89% and 100% white students. The remaining six have between 16% and 55% black students. The twenty-one schools that have between 89% and 100% white students, were pre-*Brown* white schools.

■ A large number of racially identifiable schools in a school district that formerly practiced segregation by law

gives rise to a presumption that all vestiges of state-imposed segregation have not been eliminated. *Swann, supra.* This shifts the burden to the School Board to prove that the racially-identifiable character of the schools is not in any way the product of past or present discriminatory conduct on its part. Northcross v. Board of Education of the Memphis City Schools, 466 F.2d 890 (6th Cir. 1972). In Northcross this Court said:

"It is the defendant School Board's contention that notwithstanding the fact that some 79% of its schools have an essentially monolithic racial structure it has satisfactorily cured the violation of law involved in its past *de jure* segregation and has, in fact, established a unitary school system. We cannot accept this contention."

Id at 893.

Although we are cognizant of the Board's caveat against playing the "numbers game," statistics do provide an invaluable source of information for analysis and comparison. The evidence indicates that over 80% of the schools in Louisville are racially identifiable. As in *Northcross,* the effectiveness of the Board's purported desegregation "can be gauged by a quick look at the vital statistics of the (school) system as it now exists." Id. at 892. An examination of these statistics establishes that five out of the six academic senior high schools, nine out of the thirteen junior high schools and forty out of the forty-six elementary schools are racially identifiable schools. As previously mentioned, fifty-six of the sixty-five academic senior high schools, junior high schools and elementary schools currently operated by the Board were in operation prior to *Brown* as legally-segregated schools.[4] Thirty-five of these fifty-six schools have never changed their racial composi-

---

3. In addition the Board operates two vocational schools, a residential manpower center in Shelby County, Kentucky, and a three-level school for gifted children.

4. The pattern of school construction and site selection since *Brown* has closely followed

the "neighborhood school" concept. However, of the nine new schools constructed since *Brown* six were racially identifiable with respect to student composition upon opening.

tion. Regardless of any explanation for the racial composition of any of the other schools in the system, the thirty-five pre-*Brown* schools that have retained their pre-*Brown* racial identification to the present day stand out as clear vestiges of state-imposed segregation. The Board must show that the racial composition of these schools is not the result of past discriminatory action on its part. Swann v. Charlotte-Mecklenburg Board of Education, *supra,* 402 U.S. at 26, 91 S.Ct. 1267. This it has not done. However, laudable their motives and intentions, the Board's desegregation plan has not been effective. Motivation is not the controlling factor. Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). The geographic zone assignment or "neighborhood school system" adopted by the Board, as mentioned earlier, was modified by a transfer provision. Since the pre-*Brown* white schools were generally in white residential areas and the pre-*Brown* black schools were generally in black residential areas, geographic zoning would cause these schools to retain their former racial identification. The transfer provision would enable whites who were assigned to pre-*Brown* black schools to transfer out. It also enabled blacks who were apprehensive about going to pre-*Brown* white schools to return to the black schools with which they were familiar.

■ The Board urges that changing residential patterns in the Louisville School District has contributed to the continued existence of racially identifiable schools. However, population shifts that changed the racial composition of some schools does not affect the Board's duty to convert fully to a unitary school system. *See* Kelley v. Metropolitan County Board of Education, 463 F.2d 732, 744 (6th Cir.) cert. denied, 409 U.S. 1001, 93 S.Ct. 322, 34 L.Ed.2d 262 (1972). This duty has never been fully met.

■ Geographic zoning assignment is not a permissible method for a school board to employ in dismantling the dual system and eliminating all vestiges of state-imposed segregation if it does not work. The measure. of any plan is its effectiveness in accomplishing desegregation. Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). Because of the residual effects of past discrimination, the Louisville zoning assignment plan has not been effective despite the good intentions of the school board. As the Supreme Court stated in *Swann*:

"All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. . . ."

402 U.S. at 28, 91 S.Ct. at 1282.

■ For the reasons mentioned, we find that the district court erred in holding that the Louisville Independent School District is a unitary system in which all vestiges of state-enforced discrimination have been eliminated.

Intervening plaintiffs, black and white citizen parents, filed complaints seeking desegregation of the Louisville Independent School System, and as part of the desegregation they sought the merger of the Louisville system with the Jefferson County School District and the Anchorage Independent School District, to insure complete desegregation of the entire county. The district court in dismissing the action against Anchorage, stated:

"Prior to the trial hereof, we entered certain threshold orders, to the effect that this Court lacked the judicial power to order a crossing of political boundaries as between the Jefferson County, Louisville and Anchorage Schools Districts, and, since the Anchorage School District (a very small school district located in the northeast portion of the county) was totally white, the Court, by final order with

respect thereto [dismissed the action as to Anchorage].

The court below relied on Bradley v. School Board, City of Richmond, 462 F. 2d 1058 (4th Cir. 1972), (aff'd sub nom., 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973) by an equally divided court), in holding that the court had no judicial power to cross political boundaries in this case. The court's reliance on *Richmond* was misplaced. In Bradley v. Milliken, 484 F.2d 215 (6th Cir. 1973), cert. granted, 414 U.S. 1038, 94 S.Ct. 538, 38 L.Ed.2d 329 (1973), this Court held that a federal court is not restrained by state-created political boundaries in formulating a constitutionally acceptable desegregation plan. The present case is clearly distinguishable from *Richmond*. In *Richmond*, the rejected desegregation plan involved consolidation of three school systems, even though each district was a unitary system. In the present case, both the Louisville Independent School District and the Jefferson County School District are not operating unitary school systems. *Milliken* involved the power of district courts to disregard state-created school district lines in order to achieve a unitary system in Detroit.

There is nothing so sacrosanct about the school district lines in this case that they may be permitted to curtail the broad equity powers of the federal court in implementing a mandate of the federal Constitution. If it were otherwise the supremacy clause of our fundamental charter would be a dead letter and we would revert to the "state sovereignty" principle of the long discarded Articles of Confederation. The school district lines have been disregarded in the past in conforming to state-enforced segregation. For example, in pre-*Brown* days, black high school students in the Jefferson County system attended Louisville's Central High School on a tuition basis.

 The crossing of school district lines in this case involves only a single county, the basic educational unit in Kentucky. Where there are separate school districts in a single county and the districts are not unitary systems, a federal district court may fashion an appropriate remedy without being constrained by school district lines created by state law. *Cf.* Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); United States v. Scotland City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L. Ed.2d 75 (1972); Lee v. Macon County Board of Education, 448 F.2d 746 (5th Cir. 1971).

 For the reasons stated herein, the judgments of the district court are reversed. The case is remanded to the district court for proceedings to formulate a desegregation plan for all school districts in Jefferson County, Kentucky. The district court should join all necessary parties including the previously dismissed Anchorage Independent School District. By whatever means the district court deems appropriate in the exercise of its equity powers, see Brown v. Board of Education, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083 (1955), all vestiges of state-imposed segregation must be eliminated within each school district in the county. To accomplish such purpose, state-created school district lines shall impose no barrier. We do not require use of any particular method nor approve in advance the use of any particular device. Any plan of desegregation is to be effective for the 1974–75 academic year.